Donald F. GARRETT et al., Appellants,

v.

James B. BAMFORD, Chairman, et al.

No. 75–1811.

United States Court of Appeals,
Third Circuit.

Argued Jan. 16, 1976.

Decided June 16, 1976.

---

**18.** *See* 501 F.2d at 45.

Harold E. Kohn, Stuart H. Savett, Donald L. Weinberg, Atty., Carole A. Broderick, Philadelphia, Pa., for appellants.

C. Wilson Austin, Austin, Speicher, Boland, Connor & Giorgi, Joseph E. DeSantis, McGavin, DeSantis & Koch, Reading, Pa., for appellees.

Before GIBBONS, FORMAN and RO-SENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

Black and poor residents in urban areas across the country have evinced in recent years a growing concern that property tax assessments discriminate against them.[1] Litigation against this discrimination has been notably unsuccessful, primarily due to the bar of the federal Tax Injunction Act of 1937.[2] *See, e. g., Bland v. McHann*, 463

---

**1.** *See* Clement, *Discrimination in Real Property Tax Assessment: A Litigation Strategy for Pennsylvania*, 36 U.Pitt.L.Rev. 285 (1974) [hereinafter cited as "Clement"].

**2.** 28 U.S.C. § 1341 (1970) provides:
   The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain,

F.2d 21 (5th Cir. 1972), *cert. denied*, 410 U.S. 966, 93 S.Ct. 1438, 35 L.Ed.2d 700 (1973). This appeal questions whether that statute withholds any federal remedy in an action claiming that the assessment method, as distinguished from the levy or collection of taxes, of the Board of Assessment Appeals of Berks County, Pennsylvania, is racially discriminatory. The district court held that the action was barred and dismissed the complaint. *Garrett v. Bamford*, 394 F.Supp. 902 (E.D.Pa.1975). We reverse.

## I.

■ Since this case comes to us from a jurisdictional dismissal granted on defendants' motion pursuant to Fed.R.Civ.P. 12(b)(1), the only "facts" are the allegations of the complaint. These must be taken as true for the purposes of our review. *Walker, Inc. v. Food Machinery*, 382 U.S. 172, 174–75, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); *Curtis v. Everette*, 489 F.2d 516, 518 (3d Cir. 1973), *cert. denied sub nom. Smith v. Curtis*, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974).

The named plaintiffs[3] are one non-white and two white homeowners residing in a predominantly non-white area of the City of Reading, Berks County, Pennsylvania. Named as individual defendants are members of the Board of Assessment Appeals of Berks County; the Board is also named as a defendant. Defendants are responsible for assessing the homes of plaintiffs and others residing in Berks County. The gravamen of the complaint is that the *method* of assessing the value of plaintiffs' property,

on which real estate and school taxes are based, is intentionally racially discriminatory in violation of 42 U.S.C. §§ 1981, 1983 (1970), and the Fourteenth Amendment.

■ Plaintiffs allege that their properties are assessed at values which are higher than the values assigned to similar properties in predominantly or exclusively white areas of Berks County. They further contend that their assessments constitute a greater percentage of their properties' actual value than do the assessments of properties in white areas generally. They claim that the result of the discriminatory assessments is that plaintiffs bear a disproportionately heavy burden in their city and county real estate and school taxes. Plaintiffs aver that this discrimination is systematic and intentional.[4] *Cf. Washington v. Davis*, —— U.S. ——, 96 S.Ct. 2040, 48 L.Ed.2d 597, 44 U.S.L.W. 4789, 4794 (1976).

The chief method of accomplishing this discrimination, according to plaintiffs, is defendants' failure to make annual assessments of property values as required by state law. *See* 72 P.S. § 5344(a) (Supp. 1975). Plaintiffs claim that property values in non-white areas of the county are declining, while values in white neighborhoods are increasing. Failure to make the annual assessments thus results in a tax based on higher than actual value in non-white areas and one based on lower than actual values in white neighborhoods. Accordingly, the principal relief plaintiffs seek is an injunction requiring defendants immediately to cause the assessment of all residential property within the county on a non-discrimina-

---

speedy and efficient remedy may be had in the courts of such State.

3. Plaintiffs sought to represent a class of similarly situated individuals. Because of the jurisdictional dismissal, the district court did not act on the class action question.

4. Plaintiffs also claim that this discrimination violates state law and seek to invoke the district court's pendent jurisdiction to adjudicate these counts. The exercise of pendent jurisdiction is within the district court's discretion. *Hagans v. Lavine*, 415 U.S. 528, 545–7, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); *United Mine*

*Workers of America v. Gibbs*, 383 U.S. 715, 726–29, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). We leave it to the district court to consider on remand the propriety of hearing these claims.

The complaint contained an additional count alleging that the discrimination was also "based upon the economic status and that of the areas in which [plaintiffs] live," in violation of the federal Constitution and federal law. We express no view on whether this count is within the district court's jurisdiction or states a cause of action; the district court may consider those questions on remand.

tory basis, and to make an annual assessment with proofs submitted to the court to demonstrate that the assessment is uniform and non-discriminatory.

## II.

Problems such as those presented in this case did not become part of our jurisprudence until the Supreme Court's landmark decision in *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). By holding that federal courts could enjoin the unconstitutional acts of state officials, the Court caused a major shift in the jurisprudential relationship between the federal government and the states. That decision spurred efforts by the courts and the Congress to limit the broad scope of its application.[5] The Tax Injunction Act has roots in federal equity and comity doctrine developed in Supreme Court decisions after *Ex parte Young*. The legislative history of the Act, however, demonstrates that Congress addressed the statute to a more circumscribed range of concerns than the broad federalism doctrine developed in the judicial decisions. Our analysis of the current § 1341's applicability to this case must begin with an examination of the legislative and judicial policies underlying the statute.

### A. Legislative History

The Congressional materials revealing the purposes of the Tax Injunction Act are brief but clear. Congress became concerned with the practice of large out of state corporations' using diversity jurisdiction to litigate the validity of state taxes in federal courts. The foreign corporations thus gained an advantage over state citizens who generally, under state law, had to pay the tax and then sue for a refund. Furthermore, federal litigation was time consuming and costly; municipalities often became strapped for funds and the corporations were able to reach extremely favorable settlements. Local financing was disrupted and foreign corporations escaped a large part of their tax burdens.[6]

It thus appears that the statute had a twofold purpose: eliminating unfair advantage of foreign corporations over citizens of the state and eliminating the ability of foreign corporations interminably to withhold payment of local taxes and to disrupt local financing. *See Tramel v. Schrader*, 505 F.2d 1310, 1315–16 (5th Cir. 1975); *Hargrave v. McKinney*, 413 F.2d 320 , 325–26 (5th Cir. 1969).

An additional point is worthy of note. In his Senate floor discussion of the Tax Injunction Act, its chief sponsor, Senator Bone, introduced portions of the Judiciary Committee report on the prior Johnson Act,[7] which applied similar restraints to federal injunctions against orders of state administrative agencies. Senator Bone stated that the following quotation was "applicable to [the Tax Injunction Act] in the same manner that [it was] applicable to the Johnson bill." 81 Cong.Rec. at 1416 (1937).

> The wealthy individual or corporation is thus often enabled to wear out his opponent and compel him to settle or submit to an unjust judgment for the very reason that his opponent is not financially able to follow him through the tortuous and expensive route through the Federal court to the Supreme Court of the United States at Washington. *And all the time in this dispute there is no Federal question involved.* There is a dispute arising under a State statute or law of other origin and nothing more.

*Id.* at 1417 [emphasis supplied]. This excerpt from the Congressional Record, cou-

---

5. *See generally* Wright, Law of Federal Courts, §§ 49–52, pp. 186–208 (2d ed. 1970); Bator, et al., Hart and Wechsler's The Federal Courts and the Federal System, pp. 965–1050 (2d ed. 1973) [hereinafter cited as "Hart and Wechsler"].

6. *See* 81 Cong.Rec. 1415–1417 (1937) (remarks of Senator Bone); S.Rep.No.1035, 75th Cong.,

1st Sess. (1937); H.R.Rep.No.1503, 75th Cong., 1st Sess. (1937). The Supreme Court found these materials "convincing evidence of legislative purpose." *Department of Employment v. United States*, 385 U.S. 355, 358, 87 S.Ct. 464, 17 L.Ed.2d 414 (1966).

7. 48 Stat. 775 (1934), now codified at 28 U.S.C. § 1342 (1970).

pled with Congress' apparent concern to limit the ability of *foreign* corporations to use the *diversity* jurisdiction, at least suggests that Congress did not intend the Tax Injunction Act to bar federal courts from entertaining challenges to state taxes when such challenges were based on federal law.

### B. Federal Equity Practice

Before the passage of the 1937 Act, the Supreme Court had announced that federal courts of equity would not grant relief against state taxes, even when challenged on constitutional grounds, as long as the state provided an adequate remedy. *See, e. g., Matthews v. Rodgers,* 284 U.S. 521, 52 S.Ct. 217, 76 L.Ed. 447 (1932); *Henrietta Mills v. Rutherford County,* 281 U.S. 121, 50 S.Ct. 270, 74 L.Ed. 737 (1930). In *Matthews,* the Court articulated the rationale of this equity principle:

> The scrupulous regard for the rightful independence of state governments which should at all times actuate the federal courts, and a proper reluctance to interfere by injunction with their fiscal operations, require that such relief should be denied in every case where the asserted federal right may be preserved without it. Whenever the question has been presented, this Court has uniformly held that the mere illegality or unconstitutionality of a state or municipal tax is not in itself a ground for equitable relief in the courts of the United States. If the remedy at law is plain, adequate, and complete, the aggrieved party is left to that remedy in the state courts . . . .

284 U.S. at 525–26, 52 S.Ct. at 220.

After passage of the 1937 Act, the Court rejected efforts to have federal courts issue declaratory judgments on the validity of state taxes. *Great Lakes Dredge & Dock Co. v. Huffman,* 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943). The Court did not decide whether the Act itself precluded suits, 319 U.S. at 299, 63 S.Ct. 1070, but it continued to rely on the principles of the *Matthews* lines of cases:

> Interference with state internal economy and administration is inseparable from assaults in the federal courts on the validity of state taxation . . . . .

319 U.S. at 298, 63 S.Ct. at 1073.

In *Steffel v. Thompson,* 415 U.S. 452, 472, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), the Court has recently reaffirmed the comity principles of *Matthews* and *Great Lakes. See also Moe v. Confederated Salish and Kootenai Tribes of Flathead Reservation,* —— U.S. ——, 96 S.Ct. 1634, 48 L.Ed.2d 96, 44 U.S.L.W. 4535, 4537 (1976); *Lynch v. Household Finance Corp.,* 405 U.S. 538, 542 n. 6, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972); *Perez v. Ledesma,* 401 U.S. 82, 126–28 and n. 17, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971) (Brennan, J., concurring).

From this review of the legislative history of the 1937 Act and federal equity practice, it appears that, as a general rule, injunctive or declaratory relief against state taxes can be sought in federal court only when the forums provided by the state are inadequate to the task. We turn then to an examination of the remedies provided these plaintiffs under Pennsylvania law.

### III.

Under the 1937 Act, the inquiry into state remedies seeks to ascertain whether the state, in this case Pennsylvania, provides plaintiffs with a "plain, speedy and efficient remedy" for adjudicating the claims alleged in their complaint. Supreme Court decisions construing this statutory language offer two essential points of guidance. First, although it can be argued that Congress meant to establish a more stringent standard for federal intervention, the decisions indicate that "plain, speedy and efficient" means no more than the prior equity standard of "adequacy." Second, it is sufficient for a finding of inadequacy that the availability of the state remedy be merely uncertain. Hart and Wechsler, *supra* note 5, at 979. *Spector Motor Service, Inc. v. O'Connor,* 340 U.S. 602, 605, 71 S.Ct. 508, 95 L.Ed. 573 (1951); *Township of Hillsborough v. Cromwell,* 326 U.S. 620, 66 S.Ct. 445, 90 L.Ed. 358 (1946); *Spector Motor Service, Inc. v. McLaughlin,* 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101 (1944).

## A. Pennsylvania Equity Practice

If plaintiffs could bring this action in Pennsylvania courts of equity, they would have an adequate remedy. We must initially determine, then, whether Pennsylvania equity courts would entertain this challenge to the practices in Berks County assessments.

In recent years, the Pennsylvania Supreme Court has frequently had the opportunity to consider the question of equity jurisdiction to hear challenges to local taxes. In *Lynch v. Owen J. Roberts School District*, 430 Pa. 461, 244 A.2d 1 (1968), the Court faced a challenge to an occupational tax. Writing for five justices, Justice Roberts agreed "with the general proposition that equity will not entertain an action where plaintiff has an adequate statutory remedy at law," but recognized an exception to that rule "where the controversy involves a challenge to the constitutional validity of a taxing statute . . . ." 244 A.2d at 3. Justice Cohen dissented, citing his dissent in *Studio Theaters, Inc. v. City of Washington*, 418 Pa. 73, 209 A.2d 802 (1965), where he had argued that under the statute enacting the occupational tax plaintiffs had an adequate remedy and that denied the power of equity to intervene, even in a constitutional matter.

Two years later Justice Cohen's view appeared to become the law. Writing for a four-justice majority in *Rochester & Pittsburgh Coal Co. v. Board of Assessment*, 438 Pa. 506, 266 A.2d 78 (1970), he stated:

> what is required to confer jurisdiction on an equity court is the existence of a substantial question of constitutionality (and not a mere allegation) and the absence of an adequate statutory remedy.

266 A.2d at 79. The opinion went on to imply that equity would never have jurisdiction in cases challenging real estate taxes. *Id.* Justice Roberts, joined by Chief Justice Bell, dissented, arguing that *Studio*

*Theaters* and *Lynch* allowed jurisdiction when, as in the case before him, the constitutionality of the method of assessment was at issue.

Most recently, Justice Pomeroy made a concerted effort to reconcile these divergent cases,[8] but failed to carry a majority of the Court. *Borough of Green Tree v. Board of Property Assessments*, 459 Pa. 268, 328 A.2d 819 (1974). The opinion first appears to reaffirm the rule of *Rochester*: for equity to take jurisdiction there must be a constitutional question and "either the absence of a statutorily-prescribed remedy or, if such a remedy exists, then a showing of its inadequacy in the circumstances." 328 A.2d at 823. The determination of the adequacy of the statutory remedy, in Justice Pomeroy's view, apparently involved a balancing test. *See* 328 A.2d at 825. Applying that test, he concluded that the statutory remedy was not adequate for dealing with a direct challenge to the constitutionality of a section of the Second Class County Assessment Law, 72 P.S. § 5452.7 (1968). *Id.* at 825.

Justice Pomeroy's opinion attracted only one adherent. Chief Justice Jones and Justices Eagan and Nix dissented without opinion. Justice Manderino was noted as concurring in the result. Only Justice O'Brien joined Justice Pomeroy, but Justice O'Brien also joined the concurring opinion of Justice Roberts, who adhered to the teaching of *Lynch* and criticized Justice Pomeroy's balancing analysis as confusing and unnecessary.

This review of Pennsylvania decisions illustrates the degree to which the Justices of the Pennsylvania Supreme Court have differed on the reach of equity jurisdiction in tax matters. Fortunately, we need not divine the ultimate outcome of their analytical labors. The latest Pennsylvania decision on equity jurisdiction over a constitutional challenge to a property tax that com-

---

**8.** Some effort to reconcile *Rochester* and *Lynch* was made in *Crosson v. Downingtown Area School District*, 440 Pa. 468, 270 A.2d 377 (1970), and *Campbell v. Coatesville Area*

*School District*, 440 Pa. 496, 270 A.2d 385 (1970), two cases considering challenges to occupational taxes.

manded a majority of the Court, *Rochester & Pittsburgh Coal Co. v. Board of Assessment, supra*, appears to govern this case. There plaintiffs sought "to enjoin application of a revised *method* of taxation." 266 A.2d at 78 [emphasis supplied]. The dissenting opinion reveals that the challenge in that case was comparable to the one now before us. The coal company apparently argued that the county had violated the uniformity requirement of the Pennsylvania constitution [9] by taxing "property owners in one locality on the basis of recent valuations while utilizing older, lower valuations for calculating the taxes due from taxpayers owning property in other portions of the county . . . ." 266 A.2d at 82. Thus, *Rochester* appears to bar this case from a Pennsylvania equity court simply due to the similarity between the complaints. Moreover, the Court denied equity jurisdiction on the analysis that:

> [i]n the real estate tax area most of the grave constitutional questions have already been decided, and most of the actions, including this one, question not the underlying statute but rather its application. In such a situation, the administrative body which has responsibility for applying the statute on a day-by-day basis should have the first opportunity of studying and ruling on any new application.

9. Pa.Const. art. 8, § 1 states:
   All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws.

10. Justice Pomeroy's opinion noted that the case presented "a frontal attack on the constitutionality" of a taxing statute. 328 A.2d at 825. He upheld equity jurisdiction because the complaint challenged the constitutionality of the underlying statute rather than its method of application. Justice Roberts' concurrence, 328 A.2d at 826–28, was limited to reaffirming his agreement with *Lynch*, and did not extend to his dissenting argument in *Rochester* that method challenges come within the jurisdiction of equity. Justice O'Brien joined both opinions; since Justice Roberts did not go as far as his *Rochester* dissent, Justice O'Brien cannot be understood to have wavered in his support of *Rochester*. Three justices dissented without opinion, thereby indicating their view that even

*Id.* at 79. This language suggests that any challenge, as in the case before us, to the method of application of a taxing statute will not find an equity forum in Pennsylvania.

Nothing in *Greentree* suggests that *Rochester* would not govern this case.[10] Nor is there language in any of the other Pennsylvania decisions we have reviewed which would mitigate the application of *Rochester* to this case. *Lynch*, for example, recognized an exception to equity's traditional abstention from tax cases "where the controversy involves a challenge to the constitutional validity of a *taxing statute* . . ." 244 A.2d at 3 [emphasis supplied], thereby suggesting that the exception extends only to attacks on the underlying statute. *Studio Theaters, Inc. v. City of Washington*, 418 Pa. 73, 209 A.2d 802, 805 (1965), reaffirmed this principle. *See also Narehood v. Pearson*, 374 Pa. 299, 96 A.2d 895 (1953); *County of Allegheny v. Three Rivers Management Corporation*, 16 Pa.Cmwlth. 361, 328 A.2d 567, 569 (1974); *Borough of Crafton v. Board of Property Assessments*, 7 Pa.Cmwlth. 291, 298 A.2d 643, 648 (1972).[11] Indeed, an extensive study of Pennsylvania tax cases by one commentator finds "no case on record where a Pennsylvania court has enjoined the collection of a tax on the grounds that the method of assessment was unconstitutional."[12]

the "frontal attack" in *Greentree* did not create equity jurisdiction. Two of those justices, Jones and Eagan, had voted with the *Rochester* majority. Thus, *Greentree* reveals that there are at least four justices—Pomeroy, O'Brien, Jones, and Eagan—who continue to adhere to the view that equity does not have jurisdiction over cases alleging that the method of application of a taxing statute is unconstitutional.

11. Language in *Young Men's Christian Ass'n v. City of Reading*, 402 Pa. 592, 167 A.2d 469 (1961), may suggest that a constitutional challenge to "official action" taken under a taxing statute would be within the equity jurisdiction. 167 A.2d at 472. However, it is the only Pennsylvania case in which one might read that suggestion, it cites no authority, and has not been followed in later decisions.

12. *Clement, supra* note 1, at 302.

■ This analysis of Pennsylvania decisions creates substantial uncertainty as to the availability of a Pennsylvania equity forum for the instant complaint. Following *Township of Hillsborough v. Cromwell* and the two *Spector Motor Service* cases, *supra*, we conclude that plaintiffs do not have a "plain, speedy and efficient" remedy in Pennsylvania equity courts.

### B. Administrative Appeal with Judicial Review

The statutory remedy referred to in the foregoing Pennsylvania cases is contained in the assessments legislation for counties of the third class, 72 P.S. § 5342 et seq. (Supp.1975).[13] The statute creates a three-member Board of Assessment Appeals, 72 P.S. § 5342 (Supp.1975), which must cause annual assessment of property within its jurisdiction. 72 P.S. § 5344 (Supp.1975). Assessments must be completed by the fifteenth of August of each year, 72 P.S. § 5347 (1968), and property owners must be duly notified. 72 P.S. § 5348 (1968). "Any person aggrieved by any assessment, whether or not the value thereof shall have been changed since the preceding annual assessment . . . may appeal to the board for relief." 72 P.S. § 5349(c) (Supp. 1975). Parties must be notified of hearings and the board has "the power to compel the attendance of witnesses and the furnishing of documents." 72 P.S. § 5349(d) (Supp. 1975). A final decision of the board may be appealed to the court of common pleas, which may proceed de novo. 72 P.S. § 5350 (Supp.1975).

> In the case of real property, the court shall determine, from the evidence submitted at the hearing, what ratio of assessed value to actual value was used generally in the taxing district, and the court shall direct the application of the ratio so found to the value of the property which is the subject matter of the appeal . . . .

*Id.* Decisions of the court of common pleas may be appealed. *Id.*

This statutory remedy is clearly designed for an individual taxpayer to appeal his individual assessment. *See Narehood v. Pearson*, 374 Pa. 299, 96 A.2d 895, 898 (1953); *Sharkey v. Showers*, 18 Pa.Cmwlth. 363, 336 A.2d 453 (1975). Indeed, the Pennsylvania Commonwealth Court recently upheld a lower court's rejection of an effort to form a class action out of an individual appeal from a board decision. *Sharkey v. Showers, supra*, 336 A.2d at 454. An alternative reason for the court's decision was that a class action does not lie when the members of the class have failed to exhaust their administrative remedies. *Id.*

In the instant case, the plaintiffs claim that their property and the property of members of the class they represent has been assessed at values higher than comparable property in white neighborhoods and that the ratios of their assessed value to actual value is higher than in all-white neighborhoods. The lack of a class action mechanism would impose substantial expense on plaintiffs' efforts to prove their case before the board and the common pleas court. Each individual taxpayer would have to produce evidence of the fair market value of his property before he could establish the ratio of assessed value to actual market value. "The determination must be ultimately made, on the basis of competent testimony, as to the worth of the property in the market at a fair sale." *Deitch Company v. Board of Property Assessment*, 417 Pa. 213, 209 A.2d 397, 402 (1965). In order to establish discrimination, and thus the lack of uniformity of assessments in the taxing district, he then must produce relevant evidence to show the overall current assessment ratio in the rest of the taxing district. There are several methods by which this can be done, as adverted to in *Deitch Company, supra*, but each will require proof by relevant evidence of actual market value of other prop-

---

**13.** Pennsylvania counties are divided into nine classes for the purposes of legislation and the regulation of their affairs. 16 P.S. § 210 (Supp. 1975). Berks County is a county of the third class.

erties whose assessment ratios are used as a basis of comparison.[14]  Such evidence will in all probability require expert testimony.

Gathering this evidence and hiring the necessary expert witnesses can be very expensive.  The members of the class plaintiffs claim to represent probably could share the cost of gathering the evidence, as they could do in a class action.  However, because the Pennsylvania procedure requires each person to bring a separate review action, each would have to pay his own filing fees, attorney's fees, and expert witness' fees;  these costs could not be consolidated as they could be in a class action.

These duplicative costs might be avoided if class-wide relief could be obtained from an individual review action.  However, *Sharkey v. Showers*, by holding that each individual must first exhaust his administrative remedy before seeking review from the courts, indicates that each person would have to bear the expense of proceeding before the Board.  Furthermore, there is no indication in the Pennsylvania statute or decisions construing it that the relief granted by the Board or the reviewing courts can extend beyond the individual taxpayer.

Thus, the litigational expense of the Pennsylvania statutory review procedures can be forbidding, if not insurmountable, for the individual taxpayer.  Since, according to the allegations of the complaint, many of the putative class members are in the lower economic brackets, the totality of these costs could effectively bar any attack on the allegedly discriminatory tax structure.  This is precisely the kind of situation—where courts and multiple parties must endure the expense, inconvenience, and inefficiency of separate actions at law involving the same issue and a common defendant, which might deter large groups

of individuals from seeking judicial relief— that prompted equity to develop the forerunner of today's class action mechanism. *See* Wright & Miller, Federal Practice and Procedure:  Civil § 1751.

Where legal remedies require multiple suits involving identical issues against the same defendant, federal equity practice has recognized the inadequacy of the legal remedy and has provided a forum.  *Matthews v. Rodgers*, 284 U.S. 521, 529–30, 52 S.Ct. 217, 76 L.Ed. 447 (1932);  *Hale v. Allinson*, 188 U.S. 56, 78, 23 S.Ct. 244, 47 L.Ed. 380 (1903).  *See* 16 Minn.L.Rev. 679, 683 (1932). *Matthews* rejected a multiplicity argument in favor of jurisdiction, but did not deny the application of this equity principle to federal litigation over state taxes.  Rather, the opinion found that the plaintiffs in that case did not present common issues.  Their allegation that the challenged tax statute was an unconstitutional burden on interstate commerce as applied to each of their businesses tendered issues "between them and the adverse party [which were] not necessarily identical."  284 U.S. at 530, 52 S.Ct. at 221.  Here, by contrast, the factfinding process and the issues will be identical for each plaintiff and their common adversary, for the complaint alleges not the unlawful assessment imposed on each taxpayer individually, but the unconstitutionality of the method of assessment as applied to them as a group.  In this posture, the issues of law and fact tendered by plaintiffs meet the traditional requirements for equitable intervention.

■  Moreover, adjustment of plaintiffs' taxes in one year will not necessarily prevent repetition of disparate assessments in succeeding years.  If, as plaintiffs have al-

14.  Plaintiffs argue, citing *In re Rick's Appeal*, 402 Pa. 209, 167 A.2d 261 (1961), and *In re Brooks Building*, 391 Pa. 94, 137 A.2d 273 (1958), that Pennsylvania law would bar them from introducing evidence of assessed value to actual value ratios for property in neighborhoods other than their own and thus that they could not, in any event, prove the discrimination alleged.  The more recent decision in

*McKnight Shopping Center, Inc. v. Board of Property Assessment*, 417 Pa. 234, 209 A.2d 389 (1965), and *Deitch Company v. Board of Property Assessment*, 417 Pa. 213, 209 A.2d 397 (1965), clearly indicate that assessment ratios in the entire taxing district may be introduced.  *See, e. g., Deitch, supra*, 209 A.2d at 403.

leged, the Board's discriminatory assessment pattern is intentional and systematic, the discrimination could be repeated. Plaintiffs may be required to undergo the administrative appeal route again, expending additional time, effort, and money. *In futuro* relief is not available from the statutory procedure; it acts only for the current year and for the individual taxpayer.[15] Where a state remedy for an allegedly unlawful tax requires repetitive suits year after year, "[r]esort may be had to equity . . . to avoid the multiplicity of suits . . . ." *Graves v. Texas Company*, 298 U.S. 393, 403, 56 S.Ct. 818, 823, 80 L.Ed. 1236 (1936).

■ We conclude that the Pennsylvania statutory review procedure does not provide these plaintiffs with the "plain, speedy and efficient remedy" required by section 1341 or federal equity principles. Combining this conclusion with our previous determination of the inadequacy of Pennsylvania equitable remedies, we believe that Pennsylvania law does not provide a "plain, speedy and efficient remedy" for plaintiffs' complaint.[16] Its rigid statutory procedures are not designed to protect the federal constitutional rights of taxpayers—"especially freedom from racial discrimination—from violation by state officials." *Clement, supra* note 1, at p. 279.[17]

## IV.

■ Applying our conclusion precisely to these proceedings, we hold that when plaintiffs allege systematic and intentional class-based racial discrimination in tax assessments, Pennsylvania law does not provide a "plain, speedy and efficient remedy." Thus, a federal action seeking injunctive relief to alleviate the alleged discrimination is not barred by 28 U.S.C. § 1341. The district court, therefore, had jurisdiction over plaintiffs' cause of action.

Our holding is fortified by our previous review of the legislative history of section 1341 and it is undiminished by the policy underlying federal comity doctrine in the state taxation area. The facts of this case do not present the problems Congress addressed in section 1341; indeed, a contrary situation is presented. As Section II of this opinion sets forth, Congress sought by section 1341 to attack out-of-state corporations' use of the diversity jurisdiction to impose burdensome litigation on local governments and avoid paying local taxes. A denial of a federal forum in the instant case would allow a state to depend upon burdensome piecemeal review procedures as an effective defense to an allegedly unconstitutional tax structure. Such a result would stand the legislative intent of section 1341 on its head.

**15.** We do not imply the precise relief plaintiffs request must be available to afford an adequate remedy. It is clear, however, that plaintiffs' claims, if true, will require some form of continuing relief which is not available from the statutory review procedure.

**16.** The district court reached a contrary result by speculating on the availability of Pennsylvania remedies. He recognized that the statutory procedure is designed to accommodate the "ordinary" situation of "individual appeals within a taxing district . . . ," but relied on the "ingenuity" of assessment authorities and state courts to find a "realistic and non-technical construction" of the statute that would allow them to reach the issues tendered by plaintiffs. 394 F.Supp. at 906. He apparently also recognized that *Rochester* posed a substantial bar to Pennsylvania equity jurisdiction, but concluded without analysis of other cases that the "particular pitch of this case . . . is such that it is cognizable in a court of equity in Pennsylva-

nia . . . ." 394 F.Supp. at 907. Not only is this approach unsupported speculation, but it ignores the federal standard that a state remedy is inadequate if its availability is uncertain. *Spector Motor Service, Inc. v. O'Connor*, 340 U.S. 602, 71 S.Ct. 508, 95 L.Ed. 573 (1951); *Township of Hillsborough v. Cromwell*, 326 U.S. 620, 66 S.Ct. 445, 90 S.Ct. 358 (1946).

**17.** In his dissenting opinion in *Rochester, supra*, Justice Roberts also criticized the ineffectiveness of Pennsylvania's statutory remedies in resolving constitutional challenges to taxing schemes, stating:

If a tax is inherently constitutionally defective, there is no reason to confine those affected to narrow statutory remedies. Why should every property owner in [the taxing district] have to assume the burden of appealing the propriety of his payment when the large questions could expeditiously and effectively be resolved in a single suit?

We further note that a federal hearing on plaintiffs' allegations will not produce the interference with state fiscal affairs that section 1341 and federal comity doctrine seek to avoid. If the district court finds that plaintiffs' claim has merit, it can and should mold relief so that Berks County can continue to receive tax revenues. Indeed, a beneficial result of this suit may be that assessments in the entire taxing district will be raised, thereby increasing county treasury revenues.

Accordingly, the judgment of the district court will be reversed and the case remanded for further proceedings.