ROSEWELL, TREASURER OF COOK COUNTY, ILLI-
NOIS, ET AL. *v.* LaSALLE NATIONAL BANK,
TRUSTEE

No. 79–1157.  Argued November 10, 1980—Decided March 24, 1981

504

BRENNAN, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, and REHNQUIST, JJ., joined. BLACKMUN, J., filed a concurring opinion, *post*, p. 528. STEVENS, J., filed a dissenting opinion, in which STEWART, MARSHALL, and POWELL, JJ., joined, *post*, p. 529.

*Henry A. Hauser* argued the cause for petitioners. With him on the briefs were *Bernard Carey* and *Michael F. Baccash.*

*James L. Fox* argued the cause for respondent. With him on the brief was *Donald P. Colleton.**

JUSTICE BRENNAN delivered the opinion of the Court.

The Tax Injunction Act of 1937 provides that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U. S. C. § 1341. The question we must decide in this case is whether an Illinois remedy which requires property owners contesting their property taxes to pay under protest and if successful obtain a refund without interest in two years is "a plain, speedy and efficient remedy" within the meaning of the Act.[1]

## I

LaSalle National Bank is trustee of a land trust for Patricia Cook,[2] the beneficial owner of property improved

*Henry Rose* and *Michael A. O'Connor* filed a brief for the Cook County Legal Assistance Foundation *ex rel.* Fred Schubert as *amicus curiae* urging affirmance.

[1] This Court expressly did not decide whether omission to provide interest on a successful refund application rendered a state remedy not "plain, speedy and efficient," in *Department of Employment* v. *United States*, 385 U. S. 355, 358 (1966).

[2] Patricia Cook, the real party in interest, is the beneficial owner of

506

with a 22-unit apartment building in the all-black low-income community of East Chicago Heights, Ill., located in Cook County.[3] Respondent alleged that, as of January 1, 1977, her property had a fair market value of $46,000. In accordance with a Cook County ordinance, her property should have been assessed for property tax purposes at 33% of fair market value—$15,180.[4] Instead, for the 1977 tax year, the

Illinois Land Trust No. 44891, of which LaSalle National Bank serves as trustee. Although she was not a named party in this litigation, this opinion will nevertheless refer to her as the respondent.

[3] The facts as stated in this opinion are drawn largely from respondent's complaint. For purposes of our consideration, the allegations of the complaint are accepted as true. *Walker Process Equipment, Inc.* v. *Food Machinery & Chemical Corp.*, 382 U. S. 172, 174–175 (1965).

[4] Article IX, § 4 (b), of the Illinois Constitution provides that, subject only to limitations prescribed by the State's General Assembly, counties with populations of more than 200,000, which includes Cook County, may classify real property for purposes of taxation. The classification must be reasonable, and the assessments uniform within each class. Moreover, the level of assessment of the highest class cannot exceed 2½ times the level of assessment of the lowest class in the county. Under authority of the Illinois Constitution, Art. IX, § 4, the Illinois General Assembly passed legislation requiring that any "such classification must be established by ordinance of the county board." Ill. Rev. Stat., ch. 120, § 501a (1977).

Pursuant to this authority, the Cook County Board of Commissioners passed the following ordinance:

"Section 2. Real estate is divided into the following assessment classes:

"Class 1: Unimproved real estate.

"Class 2: Real estate used as a farm, or real estate used for residential purposes when improved with a house, an apartment building of not more than six living units, or residential condominium, a residential cooperative or a government-subsidized housing project if required by statute to be assessed in the lowest assessment category.

"Class 3: All improved real estate used for residential purposes which is not included in Class 2.

"Class 4: Real estate owned and used by a not-for-profit corporation in furtherance of the purposes set forth in its charter unless used for resi-

County Assessor assessed the property at $52,150. As a result, respondent's property tax liability was $6,106 instead of $1,775, an overcharge of $4,331.

Respondent also claimed that the County Assessor "knowingly as official policy or governmental custom maintained, adopted or promulgated policy statements, regulations, decisions and systems of assessment which have produced egregious disparities in assessments throughout the County." Plaintiff's Complaint ¶ 11, App. 7. In particular, she cited a study of the Illinois Department of Local Government Affairs showing that, for 1975, property in the same class as respondent's was assessed as low as 3% and as high as 973% of fair market value. She furthermore alleged that such disparities in assessments were "far greater in number and size in older, inner city and county areas, owned, inhabited or used to a larger extent by minorities and poorer people." *Ibid.* Finally, she contended that the Assessor knew that she had previously challenged the 1974, 1975, and 1976 assessments of her property.[5]

---

dential purposes. If such real estate is used for residential purposes it shall be classified in the appropriate residential class.

"Class 5: All real estate not included in any of the above four classes.

"Section 3. The Assessor shall assess, and the Board of Appeals shall review assessments on real estate in the various classes at the following percentages of market value:

"Class 1:—22%

"Class 2:—17%

"Class 3:—33%

"Class 4:—30%

"Class 5:—40%"

Cook County, Ill., Real Property Assessment Classification Ordinance, §§ 2, 3 (originally enacted Dec. 17, 1973, as amended through June 6, 1977).

Respondent's property qualified as Class 3 real estate.

[5] Respondent had previously challenged her 1974, 1975, and 1976 property tax assessments, first by appealing to the Board of Appeals, and then

Respondent first exhausted her administrative remedy by appealing unsuccessfully for a correction of her 1977 assessment before the Cook County Board of Appeals. Ill. Rev. Stat., ch. 120, §§ 594 (1), 596, 597, 598, 599 (1977).[6] Her only remaining state remedy was to pay the contested tax under protest, and then to file an objection to the Cook County Collector's Application for Judgment before the Circuit Court of Cook County—in effect a reverse suit for refund.[7]

---

by objecting in December 1975, November 1976, and December 1977 respectively to the Collector's annual Applications for Judgment. The Circuit Court of Cook County, noting that the parties had agreed to a compromise and settlement at a pretrial conference, Ill. Rev. Stat., ch. 120, § 675a (1977), issued three separate judgments simultaneously on March 16, 1978, and ordered refunds to respondent on the erroneously collected portions of her protested tax payments, for $4,586.24, $3,656.29, and $3,937.66 respectively. Respondent had asked for refunds of $5,700, $4,750, and $5,452.41 for the three years.

[6] To challenge a property tax assessment, a Cook County property owner must follow a specific statutory procedure. See generally Ganz & Laswell, Review of Real Estate Assessments—Cook County (Chicago) vs. Remainder of Illinois, 11 John Marshall J. Prac. & Proc. 19 (1977); Parham, Procedures For Obtaining Relief With Respect To Property Tax Assessments and Rates, 61 Ill. Bar J. 306 (1973). The taxpayer may file a written complaint with the County Assessor and is thereafter entitled to a hearing. Ill. Rev. Stat., ch. 120, § 578 (1977). If no relief is obtained, the taxpayer may appeal to the Board of Appeals of Cook County for correction of the assessment. §§ 594 (1), 596, 597, 598, 599. The Board must forward one copy of the complaint to the County Assessor. § 598. Before seeking a legal remedy in state court, the taxpayer must exhaust the available administrative remedy before the Board of Appeals by filing a complaint. People ex rel. Korzen v. Fulton Market Cold Storage Co., 62 Ill. 2d 443, 446–447, 343 N. E. 2d 450, 452, cert. denied, 429 U. S. 833 (1976).

[7] After exhaustion of the Board of Appeals' administrative remedy, the taxpayer's legal remedy requires payment of the tax under protest and a subsequent court challenge. Ill. Rev. Stat., ch. 120, §§ 675, 716 (1977). See Clarendon Associates v. Korzen, 56 Ill. 2d 101, 104, 306 N. E. 2d 299, 301 (1973). The tax is due in two installments. Ill. Rev. Stat., ch. 120, §§ 705, 705.1 (1977). The taxpayer must file a written protest along with

§§ 675, 716. Although Illinois' statutory refund procedure could theoretically provide a final resolution of the dispute

the second installment payment setting forth grounds for the objection to the tax. § 675. Then, the Collector of ·Cook County publishes an advertisement giving notice and stating the date of his intended application to the Circuit Court of Cook County for judgment fixing the correct amount of any tax paid under protest. § 706. Although the month of October is the apparent target date for applying for judgment, § 710, respondent contends that the Cook County Collector's applications are not made until late November or early December, Brief for Respondent 14, n. 14. The Collector at the same time applies to the Circuit Court for judgment for sale of delinquent lands and lots whose owners have failed to pay their property tax bills. § 706.

Once the Collector's Application for Judgment is filed with the Circuit Court, the taxpayer must file a written objection to the application within a period of time specified by the judge, stating his reasons for challenging the tax. The taxpayer may raise constitutional challenges to the assessment in his objection. *LaSalle ·National Bank* v. *County of Cook,* 57 Ill. 2d 318, 324, 312 N. E. 2d 252, 255–256 (1974). After the filing of the objection, the court must hold a settlement conference between the two sides within 90 days. Ill. Rev. Stat., ch. 120, § 675a (1977). If no settlement is reached, the court must upon demand of either party set the matter for hearing within 90 days of the conference, and decide the case. §§ 675a, 716. Finally, the court enters judgment and orders a refund for any or all of the tax erroneously paid by the taxpayer. §§ 675, 716. The dissatisfied taxpayer may appeal any such judgment to the higher courts of Illinois. § 675.

Illinois courts grant equitable relief by way of injunction against collection of property taxes only when the tax is unauthorized by law or when the tax is levied on exempt properties, *LaSalle National Bank* v. *County of Cook, supra,* at 323, 312 N. E. 2d, at 255, on the basis that the state statutory refund procedure is an adequate legal remedy. *Ibid.* It has been suggested, however, that in certain cases of fraudulently excessive assessments, the statutory remedy will be found inadequate and an equitable remedy will lie. See *Clarendon Associates* v. *Korzen, supra,* at 108, 306 N. E. 2d, at 303. Accord, *Chicago Sheraton Corp.* v. *Zaban,* 71 Ill. 2d 85, 92–93, 373 N. E. 2d 1318, 1322, appeal dism'd, 439 U. S. 998 (1978); *LaSalle National Bank* v. *County of Cook, supra,* at 323, 312 N. E. 2d, at 255; *28 East Jackson Enterprises, Inc.* v. *Cullerton,* 523 F. 2d 439, 441–442 (CA7 1975), cert. denied, 423 U. S. 1073 (1976). Neither

within one year of payment of the tax under protest,[8] respondent alleged that the customary delay from the time of payment until the receipt of refund upon successful protest is two years.[9]  The tax refund is not accompanied by a payment of interest.[10]  *Clarendon Associates* v. *Korzen*, 56 Ill. 2d 101, 109, 306 N. E. 2d 299, 303 (1973); *Lakefront Realty Corp.* v. *Lorenz*, 19 Ill. 2d 415, 422–423, 167 N. E. 2d 236, 240–241 (1960).

Respondent refused to pay her 1977 property taxes and instead brought this 42 U. S. C. § 1983 action in the United States District Court for the Northern District of Illinois, seeking preliminary and permanent injunctive relief to prevent petitioner Rosewell [11] from publishing an advertisement of notice and the intended date of Application for Judgment, from applying for judgment and order of sale against her property, and from selling it.  Respondent contended that, by requiring payment of taxes $3\frac{1}{2}$ times the lawful amount, petitioners deprived her of equal protection and due process secured by the Fourteenth Amendment of the United States Constitution, and violated state constitutional and statutory rights as well.  Respondent further alleged that she had no plain, speedy, and efficient remedy in the Illinois courts.

Petitioners moved to dismiss, claiming that actions challenging state tax assessments are not cognizable under 42

---

petitioners nor respondent suggests that respondent could have obtained equitable relief.

[8] For instance, respondent's 1976 tax protest was resolved within one year from the date of payment.  Plaintiff's Complaint ¶ 14, App. 9.

[9] For purposes of their motion to dismiss in Federal District Court, petitioners agreed that the delay was two years.  Tr. of Oral Arg. 9.

[10] Respondent claimed that, based on an 8% average prime rate for the 3-year period during which she paid taxes under protest, she lost approximately $2,000 of potential interest on the use of her money.  Plaintiff's Complaint ¶ 14, App. 8–9.

[11] Respondent sued Edward J. Rosewell, the Treasurer of Cook County, and Thomas M. Tully, the County Assessor.

U. S. C. § 1983 and 28 U. S. C. § 1343,[12] and that Illinois' statutory refund procedure is a plain, speedy, and efficient remedy even though it fails to pay interest. Defendants' Motion to Dismiss, App. 11.

The District Court denied respondent's motion for a preliminary injunction and dismissed the complaint for want of jurisdiction under 28 U. S. C. § 1341.[13] App. to Pet. for Cert. 20a–21a. However, the court enjoined petitioner Rosewell from proceeding to judgment and order of sale against respondent's property pending appeal to the United States Court of Appeals for the Seventh Circuit. Fed. Rule Civ. Proc. 62 (c). The Court of Appeals reversed the District Court, holding that the Tax Injunction Act did not bar federal district court jurisdiction because Illinois' procedure of no-interest refunds after two years was not "a plain, speedy and efficient remedy." 604 F. 2d 530, 536–537 (1979).[14] A petition for rehearing and suggestion for rehearing en banc was denied. *Id.*, at 530. We granted certiorari, 445 U. S. 925 (1980), and now reverse.

---

[12] Petitioners likewise urge here that the District Court lacked jurisdiction under 28 U. S. C. § 1343 (3). Since the "Question Presented" in their petition for certiorari did not refer to this issue, Pet. for Cert. 2, we question that it is even properly before us. In any event, our resolution of the case makes it unnecessary to address this additional contention.

[13] The District Court stated:

"1. The availability of equitable and declaratory relief in the Illinois state courts provides the plaintiff with a 'plain, speedy and efficient' remedy. *Tully* v. *Griffin*, 429 U. S. 68 (1976).

"2. The non-payment of interest on refunds pursuant to Sections 675 and 716 of Chapter 120, Illinois Revised Statutes, does not render the remedy in Illinois courts not 'plain, speedy and efficient.'" App. to Pet. for Cert. 20a–21a.

[14] The Court of Appeals also held that the availability of a § 1983 action in state court does not bar federal jurisdiction under the Tax Injunction Act. 604 F. 2d, at 540. Because of the result in this case, we do not reach this issue.

## II

At the outset, it must be recognized that the issue we decide is one of statutory construction. Our task is to determine whether the Illinois refund procedure constitutes "a plain, speedy and efficient remedy . . . in the courts of such State" within the meaning of the Tax Injunction Act, 28 U. S. C. § 1341, thereby barring federal jurisdiction to grant injunctive relief. Our review of the plain language of the Act, its legislative history, and its underlying purpose persuades us that the Court of Appeals erred in holding that the Illinois remedy is not "a plain, speedy and efficient remedy."

### A

The starting point of our inquiry is the plain language of the statute itself. *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 337 (1979); *62 Cases of Jam* v. *United States*, 340 U. S. 593, 596 (1951). See *EPA* v. *National Crushed Stone Assn.*, 449 U. S. 64, 73 (1980). The Tax Injunction Act generally prohibits federal district courts from enjoining state tax administration except in instances where the state-court remedy is not "plain, speedy and efficient." On its face, the "plain, speedy and efficient remedy" exception appears to require a state-court remedy that meets certain minimal *procedural* criteria. The Court has only occasionally sought to define the meaning of the exception since passage of the Act in 1937. When it has done so, however, the Court has emphasized a *procedural* interpretation in defining both the entire phrase and its individual word components.

Discussing the general meaning of the phrase, the Court, in *Tully* v. *Griffin, Inc.*, 429 U. S. 68, 74 (1976), described its "basic inquiry" as "whether under New York law there is a 'plain, speedy and efficient' way for [the taxpayer] to press its constitutional claims while preserving the right to challenge the amount of tax due." More directly, in *Great Lakes*

*Dredge & Dock Co.* v. *Huffman,* 319 U. S. 293, 300–301 (1943), the Court stated:

> "[I]t is the court's duty to withhold such relief when, as in the present case, it appears that the state legislature has provided that on payment of any challenged tax to the appropriate state officer, the taxpayer may maintain a suit to recover it back. *In such a suit he may assert his federal rights* and secure a review of them by this Court. This affords an adequate remedy to the taxpayer, and at the same time leaves undisturbed the state's administration of its taxes." (Emphasis added.)[15]

See *Hillsborough* v. *Cromwell,* 326 U. S. 620, 625 (1946) (issue is "whether the State affords full protection to the federal rights").

What little can be gleaned from the legislative history of the Act on the phrase "plain, speedy and efficient remedy" lends further support to a procedural interpretation. Senator Bone, the Act's primary sponsor, referred to the "plain, speedy and efficient remedy" provision and then stated: "Thus a full hearing and judicial determination of the controversy is assured." 81 Cong. Rec. 1416 (1937). The Senate Report accompanying the Act mirrors Senator Bone's understanding, adding that "[a]n appeal to the Supreme Court of the United State is available as in other cases." S. Rep. No. 1035, 75th Cong., 1st Sess., 2 (1937).

The phrase "a plain, speedy and efficient remedy" in the Tax Injunction Act was "modeled" after verbatim language

---

[15] Although the issue in *Great Lakes* concerned the availability of federal declaratory relief rather than the scope of the Tax Injunction Act itself, the decision was predicated on "[t]he considerations which persuaded federal courts of equity not to grant relief . . . and which led to the enactment of the [Tax Injunction] Act." 319 U. S., at 300. We have no doubt that, had the case presented an injunction suit, the Court would have found it precluded under the Tax Injunction Act.

in the Johnson Act of 1934,[16] an Act prohibiting federal-court interference with orders issued by state administrative agencies to public utilities. As Senator Bone made clear, "[m]ost of the arguments which were used in support of the Johnson Act . . . apply in like manner" to the Tax Injunction Act. 81 Cong. Rec. 1416 (1937). Our examination of the Johnson Act and its legislative history reveals the same procedural emphasis as found in the Tax Injunction Act and its legislative history. As gloss on the words "a plain, speedy and efficient remedy," the Senate Report on the Johnson Act spoke of state laws that provided for an appeal from the determination of the state agency by any dissatisfied party. S. Rep. No. 701, 72d Cong., 1st Sess., 1–2 (1932). The Senate Report continued: "This appeal is taken to the courts of the State, thus giving to both sides of any controversy which may arise a *full hearing and judicial determination of the controversy.*" *Id.,* at 2 (emphasis added).

There is no doubt that the Illinois state-court refund procedure provides the taxpayer with a "full hearing and judicial determination" at which she may raise any and all constitutional objections to the tax. *LaSalle National Bank* v. *County of Cook,* 57 Ill. 2d 318, 324, 312 N. E. 2d 252, 255–256 (1974). Appeal to the higher Illinois courts is authorized, Ill. Rev. Stat., ch. 120, § 675 (1977), and review is ultimately available in this Court, 28 U. S. C. § 1257. Respondent does not allege any procedural defect in the Illinois remedy, other than delay,[17] that would preclude preservation and considera-

---

[16] The Johnson Act, 28 U. S. C. § 1342 (emphasis added), states in pertinent part:

, "The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where

. . . . .

"(4) *A plain, speedy and efficient remedy may be had in the courts of such State.*"

[17] This argument is discussed *infra,* at 518–521.

tion of her federal rights, since she is free to raise her equal protection and due process federal constitutional objections during the Application for Judgment proceedings before the Circuit Court of Cook County.[18] Rather, respondent's argument—that Illinois' failure to pay interest on the tax refund makes the remedy not "plain, speedy and efficient"—appears to address a more substantive concern. Whether she has any "federal right" to receive interest—a right she has not asserted and on which we express no view—it would appear that she could assert this right in the state-court proceeding. The procedural mechanism for correction of her tax bill remains the same, however, whether interest is paid or not.[19]

---

[18] Although respondent could have raised federal constitutional claims in her objection to the Collector's Application for Judgment, she expressly declined to do so in her prior objections in 1974, 1975, and 1976. For example, her objection to the 1976 tax bill stated: "Objector reserves to the federal courts the adjudication of its rights under the United States Constitution . . . ." Objections for 1976, p. 8, ¶ 8. She did claim that the ordinance and assessment were violations of equal protection and due process under the Illinois Constitution. *Id.*, at 9, ¶ 11.

[19] The dissent construes our opinion to mean that "a state remedy which could not possibly afford any relief or which had the potential for only nominal relief would defeat federal jurisdiction." *Post*, at 537 (footnote omitted). The dissent thus concludes that, under our view, "a computerized calculation accompanied by a preprinted rejection slip would qualify as a 'plain, speedy and efficient remedy.'" *Post*, at 530. But our opinion suggests nothing of the kind. We explicitly state that a state remedy must "provid[e] the taxpayer with a 'full hearing and judicial determination' at which she may raise any and all constitutional objections to the tax." *Supra*, at 514. The dissent's hypothetical computer-card remedy would hardly meet this requirement.

The Tax Injunction Act embodied Congress' decision to transfer jurisdiction over a class of substantive federal claims from the federal district courts to the state courts, as long as state-court procedures were "plain, speedy and efficient" and final review of the substantive federal claim could be obtained in this Court. Under the Illinois refund procedure, a taxpayer may raise all constitutional objections, including those based on the State's failure to pay interest or to return all unconstitutionally collected taxes, in the Illinois legal refund proceeding, *supra*, at

## B

A *procedural* interpretation of the phrase "a plain, speedy and efficient remedy," and the *procedural* sufficiency of Illinois' remedy, are supported further by analysis of the phrase's individual words. According to the 1934 edition of Webster's New International Dictionary, *plain* means "clear" or "manifest," *speedy* means "quick," *efficient* means "characterized by effective activity," and a *remedy* is the "legal means to recover a right . . . or obtain redress for . . . a wrong." Webster's New International Dictionary of the English Language 819, 1878, 2106, 2418 (2d ed. 1934).[20]

While the Court has never addressed the meaning of the word "speedy," it has interpreted the words "plain" and "efficient." Thus, the Court suggested that "uncertainty

514, after which the litigants have an opportunity to seek review in this Court. The Act contemplates nothing more.

[20] Neither the opinion below nor the brief for respondent specifies whether the remedy fails because it is not "plain," not "speedy," not "efficient," or not a "remedy" at all. The superficial linguistic difficulty of describing interest payments in these terms can be readily observed. Indeed at oral argument, respondent's counsel had some difficulty deciding under which of the words the Illinois remedy foundered:

"QUESTION: Do you equate inadequate with inefficient?

"MR. FOX: Yes, sir. 'Inadequate' has been used commonly in the federal court, sir, Mr. Chief Justice, with the 'PS&E,' plain, speedy, and efficient.

. . . . .

"QUESTION: Well, what you're saying, it seems to me, is that you treat 'efficient' as a synonym for 'adequate.' And this remedy is not efficient, that is, adequate, because it isn't speedy.

"MR. FOX: Nor is it plain.

. . . . .

"QUESTION: Well, I'm not sure what it means. Plain or fancy wouldn't make much difference. The important thing is whether it's speedy and whether it's adequate. And speedy and adequate are really interrelated, aren't they?

"MR. FOX: I believe so; yes. I think they are subsumed, that speedy is subsumed under the word adequate, which seems to be more generic." Tr. of Oral Arg. 28, 34, 35.

concerning a State's remedy may make it less than 'plain' under 28 U. S. C. § 1341." *Tully* v. *Griffin, Inc.*, 429 U. S., at 76. Earlier cases, without making a direct connection to the word "plain," have held that "uncertainty" surrounding a state-court remedy lifts the bar to federal-court jurisdiction. *Hillsborough* v. *Cromwell*, 326 U. S., at 625–626.[21] Respondent has made no argument that the Illinois refund procedure is uncertain or otherwise unclear. There is no question that under the Illinois procedure, the court will hear and decide any federal claim. Paying interest or eliminating delay would not make the remedy any more "plain."

This Court's interpretation of the word "efficient" has also stressed procedural elements. In *Tully*, the Court commented that "a State's remedy does not become 'inefficient,' merely because a taxpayer must travel across a state line in order to resist or challenge the taxes sought to be imposed." 429 U. S., at 73. In addition, without explicitly mentioning the word "efficient," we have permitted federal-court jurisdiction when the taxpayer's state-court remedy would require a multiplicity of suits, *Georgia Railroad & Banking Co.* v. *Redwine*, 342 U. S. 299, 303 (1952) (where remedy "would require the filing of over three hundred separate claims in fourteen different counties to protect the single federal claim asserted by [the taxpayer]"), or when the remedy would allow a challenge against only one of many taxing

---

[21] In *Hillsborough*, the Court concluded that, because it was at best "speculative" whether the New Jersey courts followed the federal constitutional rule that a State may not "impos[e] on him against whom the discrimination has been directed the burden of seeking an upward revision of the taxes of other members of the class," 326 U. S., at 623; see *Sioux City Bridge Co.* v. *Dakota County*, 260 U. S. 441, 445–447 (1923), federal jurisdiction would lie. In addition, protection of federal rights was uncertain because the State Board of Tax Appeals had no right to pass on constitutional questions, the allowance of a writ of certiorari to that Board from the New Jersey Supreme Court was only discretionary, and the refusal of a writ was not judicially reviewable by the Court of Errors and Appeals. 326 U. S., at 625–626.

authorities, *id.*, at 301, 303 (where suit-for-refund remedy applied only to state taxes, yet taxpayer railroad also wanted to challenge on the same basis taxes paid to counties, school districts, and municipalities). Because the Illinois remedy imposes no unusual hardship on respondent requiring ineffectual activity or an unnecessary expenditure of time or energy, we cannot say that it is not "efficient." [22]

This Court has never expressly discussed the meaning of the word "speedy," an issue that is squarely presented in this case. We must decide whether Illinois' refund after two years qualifies as a "speedy" remedy. "Speedy" is perforce a relative concept, and we must assess the 2-year delay against the usual time for similar litigation. It surely is no secret that state and federal trial courts have been beset by docket congestion and delay for many years.[23]   Whether

---

[22] A remedy to contest a tax that requires repetitive suits on the same issue in succeeding years may not be "efficient." However, on the record properly before us, the Illinois remedy has not shown itself not "efficient." It is true that respondent appealed unsuccessfully to the Board of Appeals for four straight years, 1974, 1975, 1976, and 1977, see n. 5, *supra*, but it was not until after her 1977 appeal that the Circuit Court of Cook County rendered its judgment. Therefore, neither the County Assessor nor the Board had yet had the benefit of a judicial determination to weigh in their considerations. Further resort to the Illinois statutory refund remedy would become unnecessary should subsequent assessments reflect the Circuit Court's judgment of the correct assessment.

Respondent informs us, however, that her 1978 and 1979 tax assessments were set at the 1977 discriminatory level, despite a complaint filed with the Assessor for 1978 and appeals to the Board for both years. Brief for Respondent 2. Together with her previous four appeals, respondent notes that she has been forced to take remedial action for six successive years. *Id.*, at 31, n. 27. Because these additional facts are not part of the record before us, we have not considered them. Respondent may present these new facts in her pending suit in Federal District Court to enjoin collection of her 1978 property tax. See *id.*, at 2.

[23] For instance, discussing the New York state courts in 1839, David Dudley Field noted that "[s]peedy justice is a thing unknown; and any justice, without delays almost ruinous, is most rare." Vanderbilt, Improving the Administration of Justice—Two Decades of Development, 26 U.

this is a necessary, let alone a reasonable, condition of 20th-century litigation is beside the point: The fact of the matter is that legal conflicts are not resolved as quickly as we would like.

In 1976, the median number of days from filing a complaint to disposition of a civil trial matter in 13 urban trial courts ranged from 357 to 980. National Center for State Courts, Justice Delayed 10–11 (1978).[24] In 7 of the 13, over 30% of the civil cases took more than two years from start to finish. *Id.*, at 13. The Cook County Circuit Court had a similar record: from 1974 to 1975, the average time from date of filing to verdict was about 40 months. U. S. Department of Justice, State Court Caseload Statistics: The State of the Art 7 (1978). Federal district courts have not fared much better. As of 1980, the median time interval from filing to disposition for civil cases going to trial was 20 months; 10% of those took

Cin. L. Rev. 155, 157 (1957). Many have long since lamented the seeming inseparability of judicial proceedings and delay. See, *e. g.*, National Center for State Courts, Justice Delayed 2 (1978); Lagging Justice, 328 Annuals Am. Acad. Pol. & Soc. Sci. (1960); Vanderbilt, *supra;* Warren, Delay and Congestion in the Federal Courts, 42 J. Am. Jud. Soc. 6, 7–8 (1958); Congestion and Delay: A Selected Bibliography of Recent Materials 1953–1958, in Proceedings of the Attorney General's Conference on Court Congestion and Delay in Litigation 212–245 (1958).

[24] For over half of the 13 courts surveyed, the median number of days was over a year and a half. National Center for State Courts, Justice Delayed 10–11 (1978). Delay has been a particularly pronounced problem for state trial courts located in metropolitan centers. See generally Virtue, The Two Faces of Janus: Delay in Metropolitan Trial Courts, in Lagging Justice, 328 Annals Am. Acad. Pol. & Soc. Sci. 125 (1960). This results in part from an observed correlation between population and calendar congestion. Institute of Judicial Administration, Calendar Status, in Proceedings of the Attorney General's Conference on Court Congestion and Delay in Litigation 196 (1958). For example, in 1958, the average time from the beginning of suit until the commencement of jury trial was 18.8 months for counties with populations over 750,000, 11.4 months for counties between 500,000 and 750,000, and 5.6 months for counties under 500,000. *Ibid.*

more than 46 months. Annual Report of the Director of the Administrative Office of the U. S. Courts 81, A–30 (1980). For the United States District Court for the Northern District of Illinois, the District in which respondent brought this suit, the median time interval was 23 months, with 10% of all cases over 53 months. *Id.,* at A–31.[25]

Cast in this light, respondent's 2-year wait, regrettably, is not unusual. Nowhere in the Tax Injunction Act did Congress suggest that the remedy must be the speediest.[26] The

---

[25] Current statistics are only the latest in a long history of delay and congestion in federal and state courts. Congress discussed the problem of congestion in federal district courts in connection with the Tax Injunction Act itself. 81 Cong. Rec. 1417 (1937) (remarks of Sen. Bone) (citing portions of Report on the Johnson Act deemed applicable to the Tax Injunction Act). For the year ending June 30, 1930, 37.7% of federal-question law cases terminated without a jury in 13 selected Federal District Courts took 12 months or more to complete. American Law Institute, A Study of the Business of the Federal Courts, Pt. II, p. 87 (1934). In 1942, the median time interval for civil nonjury trials from filing to disposition in all federal district courts was 12.3 months. Annual Report of the Director of the Administrative Office of the U. S. Courts, Table 9 (1942). The median time for New York's Southern District was 25 months. *Ibid.*

Unfortunately state-court statistics on civil litigation in the 1930's and 1940's are virtually nonexistent. The Institute of Judicial Administration conducted the first major compilation of state civil case data in 1953. See U. S. Dept. of Justice, State Court Caseload Statistics: The State of the Art 15, 22 (1978). Even the latest information on state-court time intervals is more complete for appellate than trial litigation. See National Center for State Courts, State Court Caseload Statistics: Annual Report 1976 (1980).

[26] Part of the problem of delay inheres in the very nature of state tax administration. There has yet to be devised a taxing system universally viewed as speedy enough to resolve complaints. This is largely because "[t]he procedures for mass assessment and collection of state taxes and for administration and adjudication of taxpayers' disputes with tax officials are generally complex and necessarily designed to operate according to established rules." *Perez* v. *Ledesma,* 401 U. S. 82, 128, n. 17 (1971) (BRENNAN, J., concurring in part and dissenting in part).

The property tax is especially vulnerable to criticism over its adminis-

payment of interest might make the wait more tolerable, but it would not affect the amount of time necessary to adjudicate respondent's federal claims. Limiting ourselves to the circumstances of the instant case, we cannot say that respondent's 2-year delay falls outside the boundary of a "speedy" remedy.[27]

---

tration. Unlike state income or sales taxes that usually can be calculated automatically from the taxpayer's income or the price of a good or service, the property tax is levied on the value of real estate. This element necessarily introduces a degree of subjective individualized judgment by the assessor that would understandably give rise to frequent taxpayer challenges and place pressure on the appellate review procedures. See generally O. Oldman & F. Schoettle, State and Local Taxes and Finance 262–265 (1974); Advisory Commission on Intergovernmental Relations, The Property Tax in a Changing Environment 3–20 (1974); H. Aaron, Who Pays the Property Tax?, 59–67 (1975); Pomp, What Is Happening to the Property Tax, 15 Assessors Journal 107, 108–116 (1980).

[27] The dissent relies on four factors which it believes "combine to make the Illinois remedial scheme demonstrably unjust." *Post*, at 538–541. Leaving aside the issue whether the phrase "demonstrably unjust" describes the proper inquiry, these four factors boil down to the same two elements of delay and failure to pay interest addressed in this Court's opinion. The dissent's first factor—"the tax assessments themselves reveal gross inequities," *post*, at 539—merely states that respondent has alleged a constitutional violation, surely not a ground for federal-court jurisdiction here. The second—that overassessment continues "notwithstanding [the taxpayer's] formal protests and the manifest error in the original assessment," *ibid.*—would appear to require error-free administration that even the best procedures could not guarantee. Indeed, absent a judicial determination of the correct assessment, it is not surprising that respondent's "formal protests" failed to persuade the Assessor and Board of Appeals of their "manifest error." See n. 22, *supra*. Here, respondent's challenges to the three tax years were resolved within two years in a single court proceeding. Those challenges explicitly were not based on federal constitutional grounds, and it is hardly the duty of federal courts to intervene in state-law tax questions. N. 18, *supra*. As we suggest, n. 22, *supra*, the Federal District Court in respondent's pending 1978 litigation may evaluate her latest claim in light of the "efficient" prong of our analysis, now that the Assessor and Board of Appeals are

## C

The overall purpose of the Tax Injunction Act is consistent with the view that the "plain, speedy and efficient remedy" exception to the Act's prohibition was only designed to require that the state remedy satisfy certain procedural criteria, and that Illinois' refund procedure meets such criteria. The statute "has its roots in equity practice, in principles of federalism, and in recognition of the imperative need of a State to administer its own fiscal operations." *Tully* v. *Griffin, Inc.,* 429 U. S., at 73.[28] This last consideration was the principal motivating force behind the Act: this legislation was first and foremost a vehicle to limit drastically federal district court jurisdiction to interfere with so important a local concern as the collection of taxes. 81 Cong. Rec. 1415 (1937) (remarks of Sen. Bone); *Great Lakes Dredge & Dock Co.* v. *Huffman,* 319 U. S., at 301 (Act "predicated upon the desirability of freeing, from interference by the federal courts, state procedures which authorize litigation challenging a tax after the tax has been paid").[29]

---

aware of the Circuit Court of Cook County's adjudication and apparently have nevertheless repeated their prior assessment practices.

The dissent's third factor—delay—and fourth factor—failure to pay interest—are addressed above.

[28] The Tax Injunction Act was only one of several statutes reflecting congressional hostility to federal injunctions issued against state officials in the aftermath of this Court's decision in *Ex parte Young,* 209 U. S. 123, 155–156 (1908) (holding that the Eleventh Amendment does not bar federal courts from enjoining unconstitutional actions of state officers). See generally *Perez* v. *Ledesma, supra,* at 106–115 (BRENNAN, J., concurring in part and dissenting in part). See also S. Rep. No. 1035, 75th Cong., 1st Sess., 1 (1937) ("This legislation does not introduce a new principle, since the Congress has passed statutes of similar import").

[29] The Court of Appeals suggested that the purpose of the Act was to prevent out-of-state corporations, through diversity suits, from delaying payment of state taxes during the pendency of federal litigation while in-state citizens would have to pay first and then litigate in state courts. 604 F. 2d, at 535. It is true that the drafters of the Act were particularly

When it passed the Act, Congress knew that state tax systems commonly provided for payment of taxes under protest with subsequent refund as their exclusive remedy. The Senate Report to the Act noted:

"It is the common practice for statutes of the various States to forbid actions in State courts to enjoin the collection of State and county taxes unless the tax law is invalid or the property is exempt from taxation, and these statutes generally provide that taxpayers may contest their taxes only in refund actions after payment under protest. This type of State legislation makes it possible for the States and their various agencies to survive while long-drawn-out tax litigation is in progress." S. Rep. No. 1035, 75th Cong., 1st Sess., 1 (1937).

See H. R. Rep. No. 1503, 75th Cong., 1st Sess., 2 (1937). See also *Matthews* v. *Rodgers*, 284 U. S. 521, 526 (1932).

It is only common sense to presume that Congress was also aware that some of these same States did not pay interest on their refunds to taxpayers, following the then-familiar rule that interest in refund actions was recoverable only when expressly allowed by statute. 3 T. Cooley, Law of Taxation

concerned with this practice of out-of-state corporations. S. Rep. No. 1035, *supra*, at 1–2; 81 Cong. Rec. 1416 (1937) (remarks of Sen. Bone). But the expansive language of the statute belies the notion that Congress was concerned exclusively with this problem. If Congress had wanted solely to address this issue, it surely would have done so by limiting the Act's jurisdictional bar to suits brought in federal diversity jurisdiction.

In addition, the Court of Appeals' narrow interpretation of the Act's purpose might have the perverse effect of making the Act moot. In 1938, one year after its passage, this Court held that federal courts in diversity suits must apply the general case law as well as statutory law of the State. *Erie R. Co.* v. *Tompkins*, 304 U. S. 64 (1938). If federal courts followed the State's equity law, then out-of-state corporations contesting taxes would be treated no differently from in-state citizens. See Note, The Tax Injunction Act and Suits for Monetary Relief, 46 U. Chi. L. Rev. 736, 743, n. 37 (1979).

§ 1308, pp. 2596–2597 (4th ed. 1924).[30]  It would be wholly unreasonable, therefore, to construe a statute passed to limit federal-court interference in state tax matters to mean that Congress nevertheless wanted taxpayers from States not paying interest on refunds to have unimpaired access to the federal courts.  If Congress had meant to carve out such an expansive exception, one would expect to find some mention of it.  The statute's broad prophylactic language is incompatible with such an interpretation.

## III

For the most part, respondent rests her case on the persuasiveness of a syllogism: the Tax Injunction Act is coterminous with pre-1937 federal equity treatment of challenges to state taxes; federal equity practice at that time viewed a no-interest refund remedy as inadequate;[31] therefore, it must follow that the Tax Injunction Act would view a no-interest refund remedy as inadequate, thereby authorizing federal jurisdiction.  Brief for Respondent 21.  This argu-

---

[30] One source suggested that the "apparent weight of authority" supported the opposite rule—that interest was allowable even in the absence of a statute.  Annot., 112 A. L. R. 1183–1184 (1938).  But even that source acknowledged the existence of the contrary view, one that "ha[d] been asserted somewhat more frequently in recent cases."  *Id.*, at 1184.  Accord, Annot., 57 A. L. R. 357–364 (1928).

[31] See *Educational Films Corp.* v. *Ward,* 282 U. S. 379, 386, n. 2 (1931); *Hopkins* v. *Southern California Telephone Co.,* 275 U. S. 393, 399–400 (1928); *Procter & Gamble Distributing Co.* v. *Sherman,* 2 F. 2d 165, 166 (SDNY 1924).  These cases' treatment of a no-interest refund remedy was undercut by later cases.  Without expressly addressing the issue, the Court in two cases decided the same day, *Matthews* v. *Rodgers,* 284 U. S. 521, 528 (1932) (Mississippi refund remedy); *Stratton* v. *St. Louis Southwestern R. Co.,* 284 U. S. 530, 534 (1932) (Illinois refund remedy), found adequate two state refund remedies that apparently did not pay interest, *Gulf, M. & O. R. Co.* v. *Webster County,* 194 Miss. 660, 662, 13 So. 2d 644, 645 (1943); *Lakefront Realty Corp.* v. *Lorenz,* 19 Ill. 2d 415, 422–423, 167 N. E. 2d 236, 240–241 (1960).  Therefore, prior federal equity practice is a two-sided sword.

ment also forms part of the basis for the Court of Appeals' decision. 604 F. 2d, at 533, n. 4. And even petitioners, Brief for Petitioners 40, suggest that the Tax Injunction Act is "a congressional confirmation of the Court's prior federal equity practice in the area of state and local taxation." [32]

We are unpersuaded. It is true that post-1937 Court cases have suggested that the Tax Injunction Act recognized and sanctioned pre-existing federal equity practice. See *Moe* v. *Salish & Kootenai Tribes,* 425 U. S. 463, 470 (1976); *Hillsborough* v. *Cromwell,* 326 U. S., at 622–623; *Great Lakes Dredge & Dock Co.* v. *Huffman,* 319 U. S., at 298–299. But these cases do no more than confirm that "the statute has its roots in equity practice," *Tully* v. *Griffin, Inc.,* 429 U. S., at 73, and that it was a longstanding rule of federal equity to keep out of state tax matters as long as a "plain, adequate and complete remedy" could be had at law. *Hillsborough* v. *Cromwell, supra,* at 622–623. Nothing in our decisions suggests that every wrinkle of federal equity practice was codified, intact, by Congress.[33]

---

[32] Commentators agree that this issue has never been definitively resolved. P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 979 (2d ed. 1973); Berry, A Federal Forum for Broad Constitutional Deprivation by Property Tax Assessment, 65 Calif. L. Rev. 828, 833–834 (1977). Most believe that the Act is not equivalent to prior federal equity practice, although they do not agree on the quantity and quality of difference. See, *e. g.,* Comment, 93 Harv. L. Rev. 1016, 1021–1022 (1980) (Act reduces scope of equity); Comment, Jurisdiction to Enforce Federal Statutes Regulating State Taxation: The Eleventh Amendment-Section 1341 Imbroglio, 70 Yale L. J. 636, 643 (1961) (Act limited relief available under equity); Note, Federal Court Interference with the Assessment and Collection of State Taxes, 59 Harv. L. Rev. 780, 783–784 (1946) (Act limited equity to relief from procedural defects in state courts).

[33] Of course, this is not to say that prior federal equity cases may not be instructive on whether a state remedy is "plain, speedy and efficient." And even where the Tax Injunction Act would not bar federal-court interference in state tax administration, principles of federal equity may never-

Indeed, Congress, among other things, legislated to solve an existing problem by *cutting back* federal equity jurisdiction. Senator Bone commented that the *"existing* practice of the Federal courts to entertain tax-injunction suits make[s] it possible for foreign corporations to withhold from a State and its governmental subdivisions taxes in such vast amounts and for such long periods as to disrupt State and county finances, and thus make it possible for such corporations to determine for themselves the amount of taxes they will pay." 81 Cong. Rec. 1416 (1937) (emphasis added). See S. Rep. No. 1035, 75th Cong., 1st Sess., 2 (1937). He furthermore noted that "[p]rovision is made that the bill is not to affect suits pending at the time of its enactment." 81 Cong. Rec., at 1415. Thus, Congress plainly did not intend to permit the federal courts after passage of the Tax Injunction Act to entertain suits in all cases cognizable by them prior to the Act.[34]

Furthermore, Congress did not equate § 1341's "plain, speedy and efficient" with equity's "plain, adequate and complete." Ever since the early days of Congress, this "plain, adequate and complete" standard of federal equity practice had been codified into statutory form. 1 Stat. 82.[35] And it was not until 1948, more than 10 years after passage of the

---

theless counsel the withholding of relief. See *Great Lakes Dredge & Dock Co.* v. *Huffman*, 319 U. S. 293, 301 (1943) (Act not "a mandatory withdrawal from [federal equity courts] of their traditional power to decline jurisdiction in the exercise of their discretion").

[34] Senator Bone noted that the Tax Injunction Act "does not take away any equitable right of a taxpayer, or deprive him of a day in court," because a "full hearing and judicial determination of the controversy" remained assured. 81 Cong. Rec. 1416 (1937). See S. Rep. No. 1035, 75th Cong., 1st Sess., 2 (1937); H. R. Rep. No. 1503, 75th Cong., 1st Sess., 2 (1937). This statement was merely declaratory of the Act's *general* continuation of an exception to its broad jurisdictional bar against federal injunctive relief.

[35] "[S]uits in equity shall not be sustained in either of the courts of the United States, in any case where plain, adequate and complete remedy may be had at law." § 16, 1 Stat. 82.

Tax Injunction Act, that the "Suits in Equity" statute was repealed. 28 U. S. C. § 384 (1946 ed.) (repealed June 25, 1948). Against this background, we will not interpret the Tax Injunction Act as substantially redundant of § 384.

## IV

Finally, we note that the reasons supporting federal non-interference are just as compelling today as they were in 1937. If federal injunctive relief were available,

> "state tax administration might be thrown into disarray, and taxpayers might escape the ordinary procedural requirements imposed by state law. During the pendency of the federal suit the collection of revenue under the challenged law might be obstructed, with consequent damage to the State's budget, and perhaps a shift to the State of the risk of taxpayer insolvency. Moreover, federal constitutional issues are likely to turn on questions of state tax law, which, like issues of state regulatory law, are more properly heard in the state courts." *Perez* v. *Ledesma,* 401 U. S. 82, 128, n. 17 (1971) (BRENNAN, J., concurring in part and dissenting in part).

The compelling nature of these considerations is underscored by the dependency of state budgets on the receipt of local tax revenues. In 1978, States derived over 61% of their revenue from property, sales, income, and other taxes. Advisory Commission on Intergovernmental Relations, Significant Features of Fiscal Federalism 53, 56 (1980). For Illinois, the percentage was even higher—67.4%. *Ibid.* The property tax is by far the most important source of tax revenue for cities and counties. For the year 1977–1978, almost 33% of all their income nationwide came from the local property tax; for Illinois' local governments, the amount was greater—39.2%. *Id.,* at 78.

The experience of Cook County itself demonstrates how ominous would be the potential for havoc should federal

injunctive relief be widely available. The county collected over $1.5 billion in real estate taxes for the tax year 1975. Ganz & Laswell, Review of Real Estate Assessments—Cook County (Chicago) vs. Remainder of Illinois, 11 John Marshall J. Prac. & Proc. 19, and n. 2 (1977). During the same year, the number of complaints filed with the Cook County Board of Appeals totaled 22,262. *Id.*, at 31, n. 61. We may readily appreciate the difficulties encountered by the county should a substantial portion of its rightful tax revenue be tied up in injunction actions.[36] If each of these complaints alleged entitlement to a refund of around $5,000, as does respondent, over $113 million in revenues potentially could be encumbered in federal-court litigation. See also City of New York, Annual Report of the Tax Commission for Fiscal Year 1978–1979, p. 14 (1979) (41,449 applications for correction of taxes owed concerning 48,170 parcels of land, of which 40,793 applications concerning 47,512 parcels of land involved hearings).

Accordingly, we hold that Illinois' legal remedy that provides property owners paying property taxes under protest a refund without interest in two years is "a plain, speedy and efficient remedy" under the Tax Injunction Act.

*Reversed.*

JUSTICE BLACKMUN, concurring.

I join the Court's opinion, but I must confess that in doing so I participate in the decision with a distinct lack of enthusiasm. I am aware of just how frustrating it can be for a conscientious property taxpayer who encounters what ap-

---

[36] It is true that, if we found the Illinois remedy inadequate because of its failure to pay interest, the State or county could avoid any problems of federally enjoined tax payments by choosing to pay interest. See *United States* v. *Livingston,* 179 F. Supp. 9, 15 (EDSC 1959) (three-judge court), aff'd *per curiam,* 364 U. S. 281 (1960). But Congress surely did not intend that the threat of federal injunctive relief be used as a lever to force States to appropriate funds for interest payable to their taxpayers.

pears to him to be unfairness, arbitrariness, delay, and an inadequacy of redress even though he might ultimately prevail on his basic contentions about existing property tax assessment and collection methods. Nearly every municipality encounters like criticism. JUSTICE STEVENS' dissent, however, indicates that Cook County's system surely is not one of the better ones.

But the Tax Injunction Act was passed for a specific purpose and I very much doubt that the cure, although it may provide a headache, is worse than the disease.

The Court's opinion demonstrates, I think, that the remedy provided by Illinois law qualifies, though perhaps only barely, as "plain, speedy and efficient," within the meaning of the Tax Injunction Act, and that federal jurisdiction to grant injunctive relief is therefore statutorily barred. Illinois—and particularly Cook County—may have little reason to be proud of the system, but it seems to pass muster under the Act. One might well hope, even though forlornly, that that system and its administration will be improved so that uncomfortable and distressing litigation like this case need not be pursued.

JUSTICE STEVENS, with whom JUSTICE STEWART, JUSTICE MARSHALL, and JUSTICE POWELL join, dissenting.

In its discussion of the jurisdictional question presented by this case, the Court correctly assumes that the administration of Cook County's system of taxing real property has violated respondent's federal constitutional rights. The question is whether she must be denied equitable relief in a federal court because Illinois affords her "a plain, speedy and efficient remedy."

Year after year Cook County requires respondent to pay a tax that is three times as great as the amount actually due and then, after a 2-year delay, the county refunds the overassessment without interest. Because the outcome of this annual ritual is predictable, the taxpayer's remedy is "plain"

and because only about 70% of the Nation's litigation is processed more rapidly, the remedy is also "speedy and efficient." That is the consequence of the Court's view that Congress was concerned with nothing more than "minimal *procedural* criteria" when it enacted the Tax Injunction Act.[1] In my view the *substance* of the State's remedy must also be considered. If the substance of the remedy is irrelevant, a computerized calculation accompanied by a preprinted rejection slip would qualify as a "plain, speedy and efficient remedy." Because I am persuaded that a reading of the federal statute that would lead to such an absurd result is manifestly incorrect, and because the Illinois refund remedy cannot fairly be characterized as adequate, I respectfully dissent.

## I

If one reads the 1937 Act against its historical background, the conclusion is inescapable that Congress did not intend an inadequate state remedy to oust a federal court of jurisdiction over a taxpayer's constitutional claim. This Court has often recognized that the statute has its roots in pre-existing equity practice. *Moe* v. *Salish & Kootenai Tribes,* 425 U. S. 463, 470 (1976); *Great Lakes Dredge & Dock Co.* v. *Huffman,* 319 U. S. 293, 298 (1943). See also *Tully* v. *Griffin, Inc.,* 429 U. S. 68, 73 (1976).[2] Both the statutory and the judicial pred-

---

[1] "On its face, the 'plain, speedy and efficient remedy' exception appears to require a state-court remedy that meets certain minimal *procedural* criteria." *Ante,* at 512.

"The procedural mechanism for correction of her tax bill remains the same, however, whether interest is paid or not." *Ante,* at 515.

"A *procedural* interpretation of the phrase 'a plain, speedy and efficient remedy,' and the *procedural* sufficiency of Illinois' remedy, are supported further by analysis of the phrase's individual words." *Ante,* at 516.

"This Court's interpretation of the word 'efficient' has also stressed procedural elements." *Ante,* at 517.

[2] In *Salish & Kootenai Tribes,* the Court stated that through enactment of § 1341, Congress "gave explicit sanction to the pre-existing federal

ecessors of the Tax Injunction Act emphasized the substance of the state remedy. Section 16 of the Judiciary Act of 1789 provided that "suits in equity shall not be sustained in either of the courts of the United States, in any case where plain, adequate and complete remedy may be had at law." 1 Stat. 82. In 1932, the Court, while recognizing the force of this rule of equity in suits to enjoin the collection of state taxes, nevertheless indicated the importance of the substance of the state remedy:

> "The effect of [Section 16 of the Judiciary Act of 1789], which was but declaratory of the rule in equity, established long before its adoption, is to emphasize the rule and to forbid in terms recourse to the extraordinary remedies of equity *where the right asserted may be fully protected at law.* See *Deweese* v. *Reinhard,* 165 U. S. 386, 389; *New York Guaranty Co.* v. *Memphis Water Co.,* 107 U. S. 205, 214.
>
> "The reason for this guiding principle is of peculiar force in cases where the suit, like the present one, is brought to enjoin the collection of a state tax in courts of a different, though paramount sovereignty. The scrupulous regard for the rightful independence of state governments which should at all times actuate the federal courts, and a proper reluctance to interfere by injunction with their fiscal operations, require that such relief should be denied in every case *where the asserted federal right may be preserved without it.* Whenever the question has been presented, this Court has uniformly held that the mere illegality or unconstitutionality of a state or

equity practice." 425 U. S., at 470. In *Great Lakes Dredge & Dock Co.,* the Court described the restraints imposed on federal equity jurisdiction prior to the passage of the Tax Injunction Act and noted that "Congress recognized and gave sanction to this practice of federal equity courts by the [Tax Injunction] Act." 319 U. S., at 298. In *Tully* v. *Griffin, Inc.,* the Court again noted that "the statute has its roots in equity practice . . . ." 429 U. S., at 73.

municipal tax is not in itself a ground for equitable relief in the courts of the United States. If the *remedy at law is plain, adequate, and complete,* the aggrieved party is left to that remedy in the state courts . . . ." *Matthews* v. *Rodgers,* 284 U. S. 521, 525. (Emphasis added.) [3]

The legislative history of the Tax Injunction Act does not support the notion that Congress intended the Act to alter the standard by eliminating consideration of the substance of the state remedy. The principal sponsor of the Act, Senator Bone, indicated that the statute assured "a full hearing and judicial determination of the controversy." 81 Cong. Rec. 1416 (1937). See also S. Rep. No. 1035, 75th Cong., 1st Sess., 2 (1937) (hereinafter 1937 Senate Report). The terms "full hearing" and "judicial determination" surely imply that the remedy may not be an empty ritual. Indeed, Senator Bone emphasized that "the bill does not take away any equitable right of a taxpayer, or deprive him of a day in court." 81 Cong. Rec. 1416 (1937). See also 1937 Senate Report, at 2.[4] The legislative history does not justify the Court's miserly reading of the statute.

---

[3] In *Educational Films Corp.* v. *Ward,* 282 U. S. 379 (1931), the Court indicated that the substance of the remedy was important by stating that the absence of interest on a refund rendered a state remedy inadequate. *Id.,* at 386, n. 2. See also *Hopkins* v. *Southern California Telephone Co.,* 275 U. S. 393 (1928).

[4] Although Congress omitted the word "adequate" from its description of a state remedy that would defeat federal jurisdiction, the omission may have been an oversight, or the inclusion of such a word may well have been considered unnecessary. Black's Law Dictionary 1163 (5th ed. 1979) defines "remedy" as "[t]he means by which a right is enforced or the violation of a right is prevented, redressed, or compensated." A court cannot insure that the federal rights are "enforced," or the violation of such rights "prevented, redressed, or compensated," without a consideration of the substance of the state remedy. Moreover, the word "efficient," which was defined as "characterized by effective activity," may have been

The conclusion that the substance of the state remedy must be considered does not rest on the premise that Congress codified intact every "wrinkle" of federal equity practice. Clearly, Congress intended the Tax Injunction Act to restrict the equity jurisdiction of the federal courts. Specifically, Congress wanted to eliminate the abuse of diversity jurisdiction by foreign corporations which were able to frustrate the state taxing process by obtaining injunctions in federal court.[5] Moreover, as the Court recognizes, *ante,* at 522, n. 28, the Act was a response to what was perceived as an unwarranted expansion of federal jurisdiction in suits to enjoin state officers that had developed in the wake of *Ex parte Young,* 209 U. S. 123 (1908).[6] The Tax Injunction Act shifted the focus

---

intended to require an effective remedy. See Webster's New International Dictionary of the English Language 819 (2d ed. 1934).

[5] The 1937 Senate Report, at 1–2, stated:

"If those to whom the Federal courts are open may secure injunctive relief against the collection of taxes, the highly unfair picture is presented of the citizen of the State being required to pay first and then litigate, while those privileged to sue in the Federal courts need only pay what they choose and withhold the balance during the period of litigation.

"The existing practice of the Federal courts in entertaining tax-injunction suits against State officers makes it possible for foreign corporations doing business in such States to withhold from them and their governmental subdivisions, taxes in such vast amounts and for such long periods of time as to seriously disrupt State and county finances. The pressing needs of these States for this tax money is so great that in many instances they have been compelled to compromise these suits, as a result of which substantial portions of the tax have been lost to the States without a judicial examination into the real merits of the controversy."

The Johnson Act, 28 U. S. C. § 1342, upon which the Tax Injunction Act was modeled, and its legislative history, reflect the same concern. The Johnson Act specifically deprived district courts of jurisdiction to enjoin the operation of, or compliance with, public utility rates when the jurisdiction of the federal court was based solely on diversity. *Ibid.;* see S. Rep. No. 701, 72d Cong., 1st Sess., 7–13 (1932).

[6] See P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 978 (2d ed. 1973) (hereinafter

of the federal courts from a determination of whether the complainant had an adequate remedy at law to a consideration of whether he had a sufficient remedy—either in equity or at law—in the state courts.[7] Although Congress thus gave important protection to state tax administration by cutting back federal equity jurisdiction, there is no reason to believe that Congress intended the expansion of the types of remedies that defeat federal jurisdiction to be accompanied by a drastic relaxation of the scrutiny given to those remedies.[8] If Congress did intend such a relaxation, the Tax Injunction Act's roots in equity are shallow indeed.

This Court has consistently employed the equity adequacy

---

Bator, Mishkin, Shapiro, & Wechsler); C. Wright, Federal Courts 215–217 (3d ed. 1976) (hereinafter Wright).

[7] Under prior federal equity practice, a state equitable remedy would not defeat the equity jurisdiction of the federal courts. *Bohler* v. *Callaway*, 267 U. S. 479, 486–488 (1925) (state equitable remedy to enjoin collection of excessive assessment would not defeat federal equity jurisdiction). See *Stratton* v. *St. Louis Southwestern R. Co.*, 284 U. S. 530, 533–534 (1932). Such an equitable remedy, however, would bar federal jurisdiction under the Act. See *Garrett* v. *Bamford*, 538 F. 2d 63, 68 (CA3), cert. denied, 429 U. S. 977 (1976); *Horn* v. *O'Cheskey*, 378 F. Supp. 1280 (NM 1974). As originally enacted, the statute deprived the district courts of jurisdiction whenever a "plain, speedy, and efficient remedy may be had *at law or in equity* in the courts of such State." 50 Stat. 738 (emphasis added). The phrase "at law or in equity" was dropped as "unnecessary" in the 1948 revision of the statute. H. R. Rep. No. 308, 80th Cong., 1st Sess., A120 (1947). See 17 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4237, p. 420 (1978) (hereinafter Wright, Miller, & Cooper).

[8] The Court is correct when it asserts that the Act was not intended to permit the federal courts to entertain suits in all cases cognizable by them prior to the Act. Given the restrictions on equity jurisdiction clearly intended by Congress, the Act was not redundant of § 16 of the Judiciary Act of 1789, 1 Stat. 82. Thus the fact that the broader jurisdiction permitted by the Suits in Equity Act existed for 10 years after the passage of the Tax Injunction Act, see *ante*, at 526–527, does not indicate that Congress did not intend the prior equity standard to apply to a determination of the adequacy of state remedies under the Tax Injunction Act.

standard in construing the Tax Injunction Act. In 1944—only seven years after the Act was passed—the Court stated that the District Court had jurisdiction because of "the uncertainty surrounding the adequacy of the Connecticut remedy." *Spector Motor Service, Inc.* v. *McLaughlin,* 323 U. S. 101, 105–106. In 1946, in *Hillsborough* v. *Cromwell,* 326 U. S. 620, 625, the Court held that "uncertainty" as to whether the state remedy "affords full protection to the federal rights" was sufficient to demonstrate that the remedy was not adequate.[9] And recently, in *Tully* v. *Griffin, Inc.,* 429 U. S., at 74, the Court indicated that to be sufficient under the statute the remedy must permit the taxpayer "to press its constitutional claims while preserving the right to challenge the amount of the tax due."[10] Thus our cases support the the-

---

[9] The Court correctly notes that the *Cromwell* Court held that because it was unclear whether the New Jersey courts would follow the constitutional rule, established by this Court in *Sioux City Bridge Co.* v. *Dakota County,* 260 U. S. 441, 445–447 (1923), that a State may not require the party suffering discrimination to seek an upward revision of the taxes of other members of the class, there was such "uncertainty surrounding the adequacy of the state remedy as to justify the District Court in retaining jurisdiction of the cause." 326 U. S., at 626. Although the Court reasons that this "uncertainty" demonstrates that the remedy was not procedurally "plain," *ante,* at 516–517, the Court fails to note that the *Cromwell* Court clearly indicated that even if the remedy were a certain one, it would be insufficient to defeat federal jurisdiction. After noting that "a long line" of New Jersey decisions "held that a taxpayer who has been singled out for discriminatory taxation may not obtain equalization by reduction of his own assessment," and that "[h]is remedy is restricted to proceedings against other members of his class for the purpose of having their taxes increased," the Court stated that "[o]n the basis of that rule it is plain that the state remedy is not adequate to protect respondent's rights under the federal Constitution." 326 U. S., at 624. Thus the Court was clearly concerned about the substance of the state remedy.

[10] The Court interprets this language to convey a procedural requirement. The "right to challenge the amount of the tax due," however, arguably would not be satisfied by a remedy that did not provide complete protection to the federal right. Moreover, in *Tully* the state remedy, a

ory that Congress, rather than making an unexplained and drastic change in the traditional equity standard as to adequacy, assumed that the prior standard would apply.[11]

This interpretation of the Tax Injunction Act and its history is consistent with the purposes of the Act. By including the "plain, speedy and efficient" exception to the stat-

declaratory judgment challenging the imposition of the tax accompanied by a preliminary injunction tolling the time period within which the taxpayer could challenge the amount of the assessment, if such a remedy existed, was clearly substantively adequate.

[11] Our decisions construing the Tax Injunction Act noted that the Act was a recognition of the prior equity practice. *Tully v. Griffin, Inc.*, 429 U. S. 68, 73 (1976); *Moe v. Salish & Kootenai Tribes*, 425 U. S. 463, 470 (1976); *Great Lakes Dredge & Dock Co. v. Huffman*, 319 U. S. 293, 298 (1943). Although the Court states that commentators agree that the issue of whether the Tax Injunction Act was a confirmation of prior equity practice has never been "definitively resolved," *ante*, at 525, n. 32, most commentators do agree that this Court has used the equitable and statutory standards interchangeably. See Bator, Mishkin, Shapiro, & Wechsler 979 ("the three major Supreme Court opinions seem to use the terms interchangeably"); Wright 216–217 ("Although it can be argued that the remedy need not be 'adequate' in the traditional equity sense in order to defeat federal jurisdiction, the Supreme Court has regarded 'plain, speedy and efficient' as meaning the same thing as 'adequate' " (footnote omitted)); Wright, Miller, & Cooper § 4237, pp. 420–421 ("plain, speedy and efficient" remedy "has been equated with 'adequate' in describing the remedy"); Berry, A Federal Forum for Broad Constitutional Deprivation by Property Tax Assessment, 65 Calif. L. Rev. 828, 833–834 (1977) (Supreme Court decisions "implied a continuing concern over the fairness of state proceedings and the narrowness of state equitable relief. Since 1937, substitution of the efficiency language for adequacy language 'has generally been ignored' "); Note, Federal Court Interference with the Assessment and Collection of State Taxes, 59 Harv. L. Rev. 780, 784–785 (1946) (arguing that "Congress intended to permit jurisdiction only where there were procedural limitations in the state remedy and not where substantive defects of law were alleged," but noting that "[t]here has been a definite failure to distinguish between inadequacy of remedy created by uncertainty as to the substantive outcome of any suit, and the fact that the taxpayer has available a complete judicial means of litigating the controversy in the state courts . . .").

utory prohibition of federal equity jurisdiction, Congress indicated its clear intent to preserve federal-court jurisdiction unless some state remedy existed. If the federal courts are limited by the Tax Injunction Act to a consideration of the procedural mechanics of the state remedy, and are forbidden to consider the substance of such a remedy, then a state remedy which could not possibly afford any relief or which had the potential for only nominal relief would defeat federal jurisdiction.[12] This form-over-substance interpretation renders the exception contained in the Act meaningless, because there would be little purpose in denying a federal remedy to a litigant and sending him to state court to pursue a state remedy—albeit a quick and certain one—that provided no relief.[13] A futile state remedy is not significantly different from no remedy at all. Similarly, an inadequate state remedy is not analytically different from a state procedure that provides a remedy as to only a portion of the litigant's claims. Such an incomplete remedy will not defeat federal jurisdiction. *Georgia Railroad & Banking Co.* v. *Redwine,* 342 U. S. 299, 303 (1952).[14] Therefore, in my view, if the

[12] For example, the Court notes that the "procedural mechanism" for the recovery of respondent's tax bill would be the same whether interest is paid or not. *Ante,* at 515. The procedural mechanism would also be the same if the state statute prohibited any refund in excess of 10% of the amount claimed.

[13] The purpose of insuring that a state remedy meets minimal procedural standards is to prevent States from erecting procedural barriers that would make the taxpayer's recovery of a refund so difficult as to be worthless. See, *e. g., Georgia Railroad & Banking Co.* v. *Redwine,* 342 U. S. 299, 303 (1952) (remedy requiring taxpayer to bring over 300 suits in 14 counties inadequate). If the state remedy is substantively inadequate, however, the purpose underlying the requirement of a procedurally adequate remedy disappears.

[14] In *Redwine,* the plaintiff railroad sought to enjoin collection of ad valorem taxes assessed by the State and every county, school district, and municipality through which the railroad's lines ran. The State argued that a suit for refund after payment of taxes, a remedy available only with respect to taxes payable to the State, would be a "plain, speedy and

state remedy does not provide adequate protection to the federal right, a federal remedy continues to be available.[15]

## II

The inadequacy of the Illinois procedure is much more than a mere failure to pay interest on overassessments. If we take the allegations of the complaint as true, as we must,

---

efficient" remedy under the statute. Noting that such a refund would apply to less than 15% of the total taxes in controversy, the Court held that the remedy would not defeat federal jurisdiction and stated that "[a]n adequate remedy as to only a portion of the taxes in controversy does not deprive the federal court of jurisdiction over the entire controversy." *Id.*, at 303, and n. 11.

[15] Lower federal courts have recognized that the statute codified the prior adequacy standard. See *Garrett* v. *Bamford,* 538 F. 2d, at 67 ("the decisions indicate that 'plain, speedy and efficient' means no more than the prior equity standard of 'adequacy' "); *Dillon* v. *Montana,* 634 F. 2d 463, 466–467 (CA9 1980) (recognizing that Congress gave explicit sanction to pre-existing equity practice and stating that "[t]he remedial certainty contemplated by § 1341 is that a state forum be empowered to consider claims that a tax is unlawful and to issue adequate relief"); *United Gas Pipe Line Co.* v. *Whitman,* 595 F. 2d 323, 325 (CA5 1979) ("Since the 1937 statute was intended as a codification of judicial practice prior to its passage, both the Supreme Court and this court have found it useful to draw on the background of pre-1937 decisions in interpreting the purposes and policies which underlie it"); *Charles R. Shepherd, Inc.* v. *Monaghan,* 256 F. 2d 882, 884 (CA5 1958) (federal court has no jurisdiction under the Tax Injunction Act if "an adequate remedy is provided for the recovery back if improperly collected"); see also *Louisville & Nashville R. Co.* v. *Public Service Comm'n,* 631 F. 2d 426 (CA6 1980) (state remedy limited to seeking upward revision of other taxpayers' assessments did not bar federal-court jurisdiction under § 1341), cert. denied, *post,* p. 959; *Alnoa G. Corp.* v. *City of Houston,* 563 F. 2d 769, 772 (CA5 1977) (if potential opportunities for abuse in the form of arbitrary city council decisions reassessing taxpayer's property became reality, "the adequacy of the state remedy might then be seriously questioned"), cert. denied, 435 U. S. 970 (1978); *Helmsley* v. *City of Detroit,* 320 F. 2d 476, 481 (CA6 1963) (remedy was "adequate and complete"); *Bland* v. *McHann,* 463 F. 2d 21, 26–27 (CA5 1972), cert. denied, 410 U. S. 966 (1973). Cf. Clement, Discrimination in Real Property Assessment: A Litigation Strategy for Pennsylvania, 36 U. Pitt. L. Rev. 285, 289 (1974).

it is apparent that four factors combine to make the Illinois remedial scheme demonstrably unjust.

First, the tax assessments themselves reveal gross inequities. Not only was respondent's property admittedly assessed at 3 times its proper assessment value, but other properties in the same class have been assessed at widely divergent rates, ranging from a tiny fraction of actual value to amounts approximately 10 times the true worth.[16] The county's practices apparently give the tax assessor a license to engage in arbitrary and invidious discrimination.

Second, because the overassessment of respondent's property was repeated year after year, notwithstanding her formal protests and the manifest error in the original assessment, it is apparent that the county's procedures do not adequately avoid the risk of repetitive error.[17] The case might well be different if it revealed an isolated mistake affecting only one

---

[16] According to a study conducted by the Illinois Department of Public Affairs and cited in respondent's complaint, these assessments ranged from 3% of actual value to 973% of actual value. See *ante,* at 507; App. 7. The Court assumes, *ante,* at 528, that the amount of respondent's refund claim is typical, and the Court notes that such disputed assessments may provide the county with an additional $113 million each year. But federal-court litigation could encumber this entire amount only if it is assumed that all refund claimants could make a showing of inequitable assessment sufficient to obtain a federal-court injunction. This assumption highlights an ironic contrast between the Court's indifference to the financial impact of the gross overassessments on the individual taxpayer, who has no lawful method of preventing such overassessments, and the Court's concern with a temporary delay in the collection of county revenues that the State could easily avoid by providing an adequate remedy.

[17] In order to conclude that respondent is powerless to prevent repetition of erroneous assessments, it is not necessary to consider respondent's assertion, not made part of the record, that the 1978 and 1979 assessments indicate that the discrimination against her has continued. Brief for Respondent 2. The four consecutive overassessments, from 1974 through 1977, sufficiently demonstrate the repetitive nature of the injury to respondent. See App. 8.

tax year. But an evaluation of the State's remedy must involve consideration not only of the fairness of the refund procedure, but also of the taxpayer's ability to prevent the same mistake from being made year after year.[18]

Third, although the 2-year period which the county requires to process a refund claim might well be tolerable if its remedy were adequate in all other respects, that time period aggravates each of the other shortcomings.[19] Indeed, like the fourth factor—the failure to pay interest—it actually provides the county with an incentive to make overassessments, because the county has the cost-free use of the taxpayer's money while her claim is being processed.

Finally, the failure to pay any interest at all, in combination with the foregoing factors, makes it a virtual certainty that the taxpayer's ultimate recovery will be worth only a fraction of the actual harm caused by the county's wrong. Cases decided prior to the Tax Injunction Act indicated that state remedies which did not provide for the payment of interest were not sufficient to defeat federal equity jurisdiction. See *Educational Films Corp.* v. *Ward,* 282 U. S. 379, 386, n. 2 (1931); *Hopkins* v. *Southern California Telephone Co.,* 275 U. S. 393 (1928); *Nutt* v. *Ellerbe,* 56 F. 2d 1058, 1062

[18] In *Garrett* v. *Bamford, supra,* at 71–72, the court held that because adjustment of the taxpayer's taxes in one year would not prevent repetition of disparate assessments in succeeding years, and because the discriminatory assessment pattern was allegedly systematic and intentional, the lack of potential *in futuro* relief was a factor contributing to the inadequacy of the state remedy.

[19] The Court reasons that the fact that respondent had to bring repetitive suits to challenge the repeated overassessments is at least in part attributable to the fact that the Board of Appeals, in considering respondent's appeals from the overassessments, did not have the benefit of the Circuit Court judgment, rendered in 1977, holding that the assessor had overassessed respondent's property and awarding her a refund. *Ante,* at 518, n. 22. That fact, however, merely underscores the cumulative effect of the delay and the taxpayer's inability to avoid repeated mistakes. The delay of the judicial determination, in addition to postponing vindication of the taxpayer's rights, fosters repetition of the error.

(EDSC 1932) (three-judge court); *Procter & Gamble Distributing Co.* v. *Sherman,* 2 F. 2d 165 (SDNY 1924). See also Lockwood, Maw, & Rosenberry, The Use of the Federal Injunction in Constitutional Litigation, 43 Harv. L. Rev. 426, 435 (1930).[20] Post-Act cases provide support for the contention that a refund must provide interest in order to defeat federal jurisdiction. *United States* v. *Livingston,* 179 F. Supp. 9, 15 (EDSC) (three-judge court), aff'd *per curiam,* 364 U. S. 281 (1960); *United States* v. *Department of Revenue,* 191 F. Supp. 723, 726–727 (ND Ill.), vacated, 368 U. S. 30 (1961).[21]

---

[20] The Court notes that the Court in two pre-Act cases, *Matthews* v. *Rodgers,* 284 U. S. 521, 525 (1932), and *Stratton* v. *St. Louis Southwestern R. Co.,* 284 U. S. 530 (1932), without expressly reaching the issue, upheld the adequacy of state remedies that "apparently" did not include interest. *Ante,* at 524, n. 31. In light of the fact, however, that none of the parties argued that the failure to pay interest rendered the remedy inadequate, and the fact that the Court did not address the failure to pay interest in either case, such cases are scant authority for the proposition that the prior federal equity cases are a "two-edged sword." See Brief for Appellants, Brief for Appellants on Reargument, Brief for Appellees, and Supplemental Brief for Appellees on Reargument in *Matthews* v. *Rodgers,* O. T. 1931, No. 84; Supplemental Brief for Appellant, Additional Brief for Appellees, Memoranda of Authority on Equity Judisdiction for Appellees, and Pet. for Rehearing in *Stratton* v. *St. Louis Southwestern R. Co.,* O. T. 1931, No. 178.

[21] In *Livingston,* the three-judge court stated:

"It is well-settled that a right to recover taxes illegally collected is not an adequate remedy if it does not include the right to recover interest at a reasonable rate for the period during which the taxpayer's money is withheld. Even if existence of the right be merely cast in substantial doubt, the remedy is not plain or adequate.

.        .        .        .        .

"South Carolina may allow interest upon refunds of taxes or not as she chooses. If she does not make clear the existence of the right to recover such interest, however, she necessarily opens the door to equitable relief to taxpayers and forecloses a remission of the parties to the legal remedy provided by her statutes." 179 F. Supp., at 15. (Footnote omitted.)

In *United States* v. *Department of Revenue,* the court held that a state

It is not necessary in this case, however, to decide whether the failure to pay interest alone would render a state remedy inadequate.[22] Few remedies fully compensate the victim of official wrongdoing, but surely one would not characterize a remedy that could never exceed one-half or two-thirds of the amount taken as a complete and adequate remedy. Yet if a county may collect 3 to 10 times the amount of tax that a citizen owes and use the excess for two years without paying any interest, the value of that which is ultimately returned is not complete or adequate compensation for the value of what was unjustly taken.[23]

---

requirement that a bond be posted which did not provide for recoupment of the cost of the bond was analogous to the failure to award interest on refunds and therefore was not an adequate state remedy. See also Wright, Miller, & Cooper § 4237, p. 423.

[22] In some cases, failure to pay interest would certainly not be enough to render a remedy inadequate. If the amount of the interest were small, either because the amount of the refund was small or the time necessary to obtain the refund was short, then the failure to pay interest would not be a substantial defect in the remedy. See *Group Assisting Sewer Proposal-Ansonia* v. *City of Ansonia*, 448 F. Supp. 45, 47 (Conn. 1978); *Abernathy* v. *Carpenter*, 208 F. Supp. 793, 796–797 (WD Mo. 1962), aff'd *per curiam*, 373 U. S. 241 (1963). See also Comment, 93 Harv. L. Rev. 1016, 1023–1024 (1980).

[23] In *Procter & Gamble Distributing Co.* v. *Sherman*, 2 F. 2d 165 (SDNY 1924), Judge Learned Hand held that the uncertainty of the availability of a refund rendered a remedy inadequate. He further noted:

"But quite independently of such doubts, the relief is inadequate because of the express refusal to allow interest. . . . While I have been referred to no decision on the point, it seems to me plain that it is not an adequate remedy, after taking away a man's money as a condition of allowing him to contest his tax, merely to hand it back, when, no matter how long after, he establishes that he ought never to have been required to pay at all. Whatever may have been our archaic notions about interest, in modern financial communities a dollar to-day is worth more than a dollar next year, and to ignore the interval as immaterial is to contradict well-settled beliefs about value. The present use of my money is itself a thing of value, and, if I get no compensation for its loss, my remedy does not altogether right my wrong." *Id.*, at 166.

The Court seems to assume that the nonpayment of interest has no effect on the amount of time that will be spent in processing refund claims.[24]   In my opinion the Court is quite wrong.   When no interest is paid—or when the rate of interest on judgments is significantly lower than the prevailing market rate—the law rewards the dilatory defendant who can postpone the ultimate day of reckoning for as long as possible.   The same powerful market forces are at work when a public body is the defendant.   Whether or not one agrees with the opinion of the Court of Appeals that the payment of interest is an essential ingredient of any adequate refund remedy, it seems perfectly clear that, given the factors disclosed by this record, the remedy afforded by Illinois is indeed inadequate.[25]

It follows that federal jurisdiction is not defeated by the Tax Injunction Act and the judgment of the Court of Appeals should therefore be affirmed.

---

[24] "The payment of interest might make the wait more tolerable, but it would not affect the amount of time necessary to adjudicate respondent's federal claims." *Ante,* at 520–521.

[25] Because I would rely on the cumulative effect of the four factors discussed, and not on the failure to pay interest alone, to hold that the state remedy is inadequate, there is no need to respond to the Court's point, *ante,* at 523, that Congress must have been aware that many States did not pay interest on tax refunds.  Congress may have been aware that some States did not pay interest on refunds and may have even sanctioned the practice, but there is no reason to believe that Congress implicitly approved the inadequate remedy provided by Cook County in this case.