PHILLIPS TOWING SERVICE, INC., Lincoln Towing Service, Inc., Second City Towing, Inc., Rokaitis Industries, Inc., Red's Auto Body Shop, Inc., Lakeshore Towing, Inc., William Brown d/b/a D & E Towing Service, The New C & L Towing Service, Inc., Rendered Services, Inc., Star, Inc., Blue Knight Towing, Inc., Al Piecul d/b/a George's Towing, and Suburban Towing, Inc., Plaintiffs,

v.

Mary B. BUSHNELL, Andrew C. Barrett, Ruth K. Kretschmer, Susan C. Stone, Calvin K. Manshio, Raymond G. Romero, and Paul G. Foran, in their official capacities as Commissioners of the Illinois Commerce Commission, Defendants.

No. 89 C 881.

United States District Court, N.D. Illinois, E.D.

Aug. 18, 1989.

become mighty, and the mighty turn plaintive. Before this court presently are fourteen Northeastern Illinois car towing companies. They are not in the business of rescuing motorists who become stranded on this state's highways. Rather, they are engaged in what those not learned in the law often call piracy: they tow away vehicles which are parked (illegally, of course) on private property, and hold these vehicles until their owners "ransom" them.

Of course, one engaged in such a business could not hope to escape public notice, to put it mildly. Such notice invariably gives rise to attempts at public regulation. In 1978 Illinois enacted the Commercial Relocation of Trespassing Vehicles Law, 1978 Ill. Laws 1752, codified as amended at Ill.Ann.Stat. ch. 95½ ¶¶ 18a–100 et seq. (Smith–Hurd 1988 Supp.). This law states in part that the Illinois Commerce Commission ("ICC") shall "[s]et reasonable rates" —the ransom referred to earlier—"not to exceed $45, for the commercial towing or removal of trespassing vehicles from private property." *Id.* at ¶ 18a–200(6). Additionally, the law provides that the ICC "may exercise any and all powers with respect to establishment and adjustment of fees with respect to commercial vehicle relocators which it may exercise with respect to motor carriers" under *id.* at ¶ 18c–1501(2)–(4). *Id.* at ¶ 18a–602(1).

The plaintiff towers [1] have sued the individual members of the ICC in their official capacities in this court. (The court will refer to the defendants collectively as the ICC.) The towers contend that Illinois has treated their constitutional rights as if those rights were mere trespassing vehicles. In Count 1 of their Amended Complaint they allege that the $45.00 ceiling on rates set forth in ¶ 18a–200(6) wrongfully takes their property in violation of the Fifth and Fourteenth Amendments to the Federal Constitution. In Count 2 they assert that, because of the rate ceiling, the

Donald S. Rothschild and Mark C. Gross, Donald S. Rothschild & Associates, Ltd., Oak Park, Ill., for plaintiffs.

Edward P. O'Brien and Myra L. Karegianes, Illinois Commerce Com'n, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

A federal judge witnesses incredible things before his bench. He sees the lowly

---

1. The court will not refer to the plaintiffs as "commercial relocators," as the term has a faint- ly Orwellian flavor.

ICC cannot fulfill its mandate under ¶ 18a–200(6) to set "reasonable rates," and thus the ICC has denied the towers their right to due process under the Fourteenth Amendment. In Count 3 they argue that the rate ceiling discriminates against the towers and thereby denies them their right to equal protection of the laws under the Fourteenth Amendment.

This is not all they allege. In Count 4 they charge that a $25.00 fee on each of their contracts with property owners to remove illegally parked vehicles is an unlawful tax, imposed in violation of their rights under the Fourteenth Amendment.[2] In Count 5 they assert that the rate ceiling unlawfully burdens interstate commerce in violation of art. I, § 8(3) of the Constitution. Last, in Count 6 they allege that the rate ceiling violates their rights under the Illinois Constitution.

The ICC has moved to dismiss the towers' Amended Complaint on a variety of grounds. The ICC first contends that this court may not reach Count 6 because of the Eleventh Amendment to the Constitution. The ICC's argument rests on the holding of the Supreme Court in *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 106, 104 S.Ct. 900, 911, 79 L.Ed.2d 67 (1984), where the Court determined that the Eleventh Amendment barred the federal courts from enjoining actions of state officials solely on the basis of a violation of state law. While the Court seemed to suggest that its ruling was limited to instances where the injunction would have had "an impact directly on the state itself," *id.* at 117, 104 S.Ct. at 917—language which evokes the distinction between retrospective and prospective injunctions set forth in *Edelman v. Jordan*, 415 U.S. 651, 666–67, 94 S.Ct. 1347, 1357–58, 39 L.Ed.2d 662 (1974)—the Seventh Circuit has insisted that *Pennhurst* bars all claims for an injunction against a state based solely on a violation of state law. See *Gomez v. Illinois State Bd. of Educ.*, 811 F.2d 1030,

1036 (7th Cir.1987) (violation of state law not ground for injunction against the state unless violation itself contravenes Constitution); *Wisconsin Hosp. Ass'n v. Reivitz*, 820 F.2d 863, 868 (7th Cir.1987) (*Pennhurst* bars attempts of federal courts "to coerce state officials to obey state law"); *Bennett v. Tucker*, 827 F.2d 63, 71 n. 3 (7th Cir. 1987) (same); *Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461, 469 (7th Cir.1988) (no federal jurisdiction to issue writ of mandamus to state official ordering him to comply with state law); *Bethune Plaza, Inc. v. Lumpkin*, 863 F.2d 525, 527 (7th Cir.1988) ("a district court may not use its views of state law as the basis for relief against the state itself"). This court thus dismisses Count 6 for lack of subject-matter jurisdiction.

The ICC's other objections to the Amended Complaint require greater discussion than that addressed above. The ICC first contends that this court has no jurisdiction over the towers' claims by virtue of the Johnson Act, 28 U.S.C. § 1342 (1982). The Act as amended provides:

> The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:
>
> (1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,
>
> (2) The order does not interfere with interstate commerce; and,
>
> (3) The order has been made after reasonable notice and hearing; and,
>
> (4) A plain, speedy and efficient remedy may be had in the courts of such State.

The towers concede that the ICC is an administrative agency of the State of Illi-

---

**2.** At the time the towers filed this suit, this fee was a mere proposal. It was scheduled to be effective July 1, 1989, and so the ICC moved to dismiss Count 4 for lack of a ripe controversy. July 1 has passed, and the court has not heard if the ICC withdrew the fee. Accordingly, the court will treat Count 4 as ripe for adjudication. This was the ICC's sole attack on Count 4, and thus there is no ground for dismissing it.

nois. They grant further that they allege jurisdiction in this court on the basis of the repugnance of the state's regulatory scheme to the Federal Constitution, that the ICC has always acted after reasonable notice and hearing, and that the towing companies have satisfactory remedies in the courts of the State of Illinois. They contest the presence of the other factors, however, which would allow the jurisdictional bar of the Johnson Act to fall: whether their complaint attacks an "order affecting rates," whether they are "public utilities," and whether the regulations which they challenge interfere with the interstate commerce.

The towers' contention that they are not attacking an "order affecting rates" within the terms of the Johnson Act is somewhat inconsistent with the allegations of their Amended Complaint. As noted earlier, the towers filed suit against the ICC, but their complaint suggests (and their brief on the ICC's motion does not urge the contrary) that the towers' beef is with the State of Illinois, in its enactment of the $45.00 ceiling on their rates. Admittedly, under ¶ 18a–200(6) Illinois cannot effect the rate cap without an ICC order, as the law gives only the ICC the power to set rates. But the Illinois General Assembly effectively sets a rate under this statute when the ICC otherwise might set a rate in excess of $45.00. The towers proceed before this court on the assumption that the ICC has set the current $45.00 rate because the law prevents it from going higher, and not because $45.00 is what the ICC views as a reasonable rate.[3]

Rather than construe the Amended Complaint at this early stage of this case as attacking an ICC determination to set a

reasonable rate at $45.00—a decision which would be an "order affecting rates"—this court will take the towers at their word. The court thus construes Counts 1–3 and 5 as attacking a law which sets rates, a law enacted not by a State administrative agency or a rate-making body of a State political subdivision, but by a State legislature. The Johnson Act thus does not divest this court of jurisdiction over this dispute.

■ Even if the court were to construe Counts 1–3 and 5 as attacking an ICC rate order, the Johnson Act still would not strip this court of jurisdiction. This is because the towing companies regulated under the Illinois Commercial Relocation of Trespassing Vehicles Law are not public utilities within the meaning of the Johnson Act.[4] The court begins its construction of the Act's term "public utility" by examining the words themselves. See *Plumbers' Pension Fund, Local 130, U.A. v. Niedrich*, 701 F.Supp. 651, 653 (N.D.Ill.1988) (proper statutory construction begins with plain meaning of the words used, then if necessary progresses to examination of the context of the phrase, the reasonableness of alternative constructions, and lastly the phrase's legislative history). On previous occasions where this court examined the plain meaning of statutory terms, the statutes in question were of recent origin. See *id.* at 652–55 (construing 29 U.S.C. § 1145 (1982), enacted in 1980); *Bastian v. Petren Resources Corp.*, 699 F.Supp. 161, 162–64 (N.D.Ill.1988) (construing 18 U.S.C. § 1964(c) (1982), enacted in 1970). By contrast, Congress passed the Johnson Act in 1934, and the Supreme Court has indicated that in construing its language, the courts should try to adopt the perspective of the members of the Seventy–Third Congress. See *Rosewell v. LaSalle National Bank,*

---

**3.** The commercial relocation law's history supports this view. Prior to amendment of the law, the ICC was free to set reasonable rates without worrying about statutory ceiling. See *Pioneer Towing, Inc. v. Illinois Commerce Comm.*, 99 Ill.App.3d 403, 405, 54 Ill.Dec. 892, 894, 425 N.E.2d 1109, 1111 (1981).

**4.** This court reaches its conclusion from the analysis that follows, and not on account of the decision urged upon this court by the towers, *Pioneer Towing*, 99 Ill.App.3d at 408, 54 Ill.Dec.

892, 425 N.E.2d 1109. There the court stated, "Relocation towers ... differ vastly from public utilities.... The prime difference is that towers are not compelled to serve the public.... The nature of [Pioneer Towing's] business does not allow it the protections extended to public utilities." While that court's observations about the towers' business are apt, it was not interpreting the term "public utility" under the Johnson Act. Its decision thus does not control this court's resolution of this question.

450 U.S. 503, 513–14, 516–21, 101 S.Ct. 1221, 1229–30, 1230–33, 67 L.Ed.2d 464 (1981) (examining definitions of "plain," "speedy," and "efficient" in Webster's Third New International Dictionary (2d ed. 1934)).

Neither party has graced the court with Webster's 1934 definition of "public utility." The court has found one definition of the term, however, from a source that was in use that year. According to the Ballentine Law Dictionary (1930), "public utility" meant "a corporation or business rendering, and devoting its property to, a public use or service." Today one might call such a company merely a "utility." The other modern meaning of "public utility," connoting a publicly owned utility, probably was not the one used by the Seventy–Third Congress. The legislative history of the Johnson Act indicates that Congress did not intend to bar the lawsuits of publicly owned utilities from the federal courts, but rather it wished to oust challenges to rate orders brought primarily by privately owned utilities. See, for example, 73 Cong. Rec. 2016 (Feb. 6, 1934) (Sen. Austin, pointing out that the Act raised "[t]he sole question ... whether the Congress ... should discriminate against those millions of investors in public-utility securities who have made their investments in reliance on rights which have been theirs since public-utility regulation began"); id. at 2028 (Sen. Herbert, stating that the Act "singles out" utility stockholders); 73 Cong.Rec. 8330 (May 8, 1934) (Rep. Miller, decrying advantages given to "the corporation, the public utilities" through their ability to attack rate orders in federal court); id. at 8337 (Rep. McGugin, chiding out-of-state corporations for not submitting themselves to state utility regulations).

In light of the 1930 definition of public utility, which this court is confident Congress used in drafting the Johnson Act, this court determines that the towers are not public utilities. The towers are private businesses who devote their property not to public uses or services, but to narrow private ends. One Illinois court has described the plaintiffs' business further as being competitive, and not naturally monopolistic. "The prime difference [between towing companies and public utilities] is that towers are not compelled to serve the public." *Pioneer Towing*, 99 Ill.App.3d at 404, 406–08, 54 Ill.Dec. 892, 425 N.E.2d 1109. Anyone whose car has been "relocated" can appreciate the *Pioneer Towing* court's observation.

■ The Johnson Act thus does not strip this court of jurisdiction.[5] The ICC urges the court, however, to abstain from ruling on the towers' claims in light of the principles announced in *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). In *Burford*, the Sun Oil Company attacked the validity of an order of the Texas Railroad Commission permitting Mr. Burford to drill four wells in the East Texas oil field. The Commission issued its permits pursuant to a general regulatory system for the conservation of oil and gas in Texas, which the Court described as being " 'as thorny a problem as has challenged the ingenuity and wisdom of legislatures.' " *Id.* at 318, 63 S.Ct. at 1099, quoting *Railroad Commission v. Oil Co.*, 310 U.S. 573, 579, 60 S.Ct. 1021, 1023–24, 84 L.Ed. 1368 (1940).

Principal regulatory responsibility for the East Texas field was Texas's. The State's interest in regulating the field, the Court noted, went beyond conservation of resources, as the entire Texas economy depended upon the oil and gas industry. The State delegated the balancing of these interests to its Railroad Commission. Given the complexity of the issues and the size of the stakes in regulating the industry, disputes were numerous. As a result, the Commission and the Texas courts had developed a body of expertise on oil and gas regulation. As the Court explained, "suffice it to say that the Texas courts are working partners with the Railroad Com-

---

5. Because of the alternative bases for this holding, the court will not address the towing companies' argument that ¶ 18a–200(6) interferes with interstate commerce within the meaning of the Johnson Act. Deciding this issue is unnecessary, and would lead to premature consideration of questions raised in Count 5 of the Amended Complaint.

mission" in regulating the industry. To this end, the Texas legislature concentrated review of Commission orders in one court, creating uniformity of decision and eliminating confusion. *Burford,* 319 U.S. at 318–25, 63 S.Ct. at 1099–1103.

Justice Black observed that, "[a]s a practical matter, the federal courts can make small contribution to the well organized system of regulation and review which the Texas statutes provide." The Texas courts were capable of providing full relief, while "[d]elay, misunderstanding of local law, and needless federal conflict with state policy" would be "the inevitable product" of federal intervention. The Court thus concluded that, given the "basic problems of Texas policy" involved in Commission-related matters, the federal courts should have exercised their equitable discretion and abstained from Sun Oil's dispute. *Id.* at 325–32, 63 S.Ct. at 1103–07.

From this case has come what is known as *"Burford* abstention." The Court has held that this form of abstention is appropriate when federal review of questions of state law "in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Colorado River Water Cons. Dist. v. U.S.,* 424 U.S. 800, 814, 96 S.Ct. 1236, 1245, 47 L.Ed.2d 483 (1976); see also *New Orleans Public Service, Inc. v. Council of City of New Orleans,* — U.S. —, —, 109 S.Ct. 2506, 2512–14, 105 L.Ed.2d 298 (1989). Unlike instances where courts should abstain to avoid federal constitutional questions, see, for example, *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1940), or to reduce conflict with on-going state proceedings, see, for example, *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), in cases where federal jurisdiction is premised on the presence of a federal question, and one party asks the federal court to abstain for the reasons announced in *Burford,* the justification required for abstention may be great. See *Colorado River,* 424 U.S. at 815 n. 21, 96 S.Ct. at 1245 n. 21. The Court's cases involving *Burford* abstention in disputes arising under federal law bear

this out. See Julie A. Davies, *Pullman* and *Burford* Abstention: Clarifying the Roles of State and Federal Courts in Constitutional Cases, 20 U.C. Davis L.Rev. 1, 11–15 (1986).

The Seventh Circuit's cases discussing *Burford* abstention have hewed closely to *Colorado River's* description of the doctrine. They indicate that in order to claim *Burford* abstention, the party seeking it must demonstrate that the state is striving to establish a coherent policy with respect to a matter of great importance to that state's citizens. Many things can indicate the importance of a matter to a state. One is a long history of state regulation. See *Wynn v. Carey,* 582 F.2d 1375, 1383 (7th Cir.1978) (refusing to abstain where state did not demonstrate expertise in regulating parental consent to a minor's abortion, as state began regulating in 1977). Another is the special nature or complexity of the state's laws. See *id.* (abstention not proper where state scheme did not involve a "specialized aspect of local law"); *Evans v. City of Chicago,* 689 F.2d 1286, 1296 (7th Cir.1982), rev'd on other grounds, 873 F.2d 1007 (7th Cir.1989) (citing cases denying motion for abstention involving conditions at juvenile detention home, residential zoning, and granting of cable television franchise; none involved "complex" statutes or regulatory schemes); *Board of Educ. of Valley View v. Bosworth,* 713 F.2d 1316 (7th Cir.1983) (simple, easy-to-read state tax law, one not a product of a specialized state agency, does not evince heightened state expertise; abstention not warranted). Unique procedures or tribunals for adjudicating regulatory disputes are still other ways of indicating importance. See *Local Div. 519, Etc. v. LaCrosse Mun. Transit U.,* 585 F.2d 1340, 1350 (7th Cir.1978) (abstention inappropriate where state's system of regulating public employee labor disputes did not have peculiar procedures or special tribunals for resolving disputes); *Evans,* 689 F.2d at 1296 (abstention inappropriate where state laws allowing municipality to decide how to satisfy tort judgments did not erect special system of review); *Bosworth,* 713 F.2d at 1320 (state

evinced relative disconcern for tax policy by not erecting special tribunal; abstention not warranted). A large, judicially cognizable influence of the industry upon the state's economy can raise a like inference. See *Evans*, 689 F.2d at 1296, citing *Three Rivers Cablevision v. City of Pittsburgh*, 502 F.Supp. 1118 (W.D.Pa.1980) (municipal cable television franchise not important outside of its locality; abstention not necessary).[6]

Proving that something is vitally important to the state will not automatically result in *Burford* abstention.[7] Nevertheless, requiring a party to show through objective signs like those listed above the importance of a particular matter to a state best prevents parties from using the existence of state regulations—no matter how simple those regulations are—to deprive plaintiffs improperly of their right to receive the benefits of a federal forum. See Martha A. Field, Abstention in Constitutional Cases: The Scope of the *Pullman* Doctrine, 122 U.Pa.L.Rev. 1071, 1156–57 (1974); Davies, 20 U.C. Davis L.Rev. at 47–48.

Few, if any, of the factors recounted above are present here. Illinois commenced administrative regulation of car towing companies in 1978. Prior to that time, general principles of law controlled

the companies' activities. See *Pioneer Towing*, 99 Ill.App.3d at 406, 54 Ill.Dec. 892, 425 N.E.2d 1109. While the ICC's regulation of the industry may be complex, the question before this court—Illinois' $45.00 cap on the towers' fees—is not a product of these regulations, according to the towers. It is a discrete policy enacted by the Illinois General Assembly, which this court presumes it can separate from the ICC's general regulatory scheme.[8] Illinois does not concentrate review of the ICC's regulations of towers in a special court or tribunal; instead, a person can seek review of these regulations in many Illinois courts. See Ill.Ann.Stat. ch. 95½, ¶ 18a–103 (providing for review of ICC orders under Illinois Administrative Review Law, Ill.Ann.Stat. ch. 110, ¶¶ 3–101 et seq. (Smith–Hurd Ann.1983)); *Id.* at ¶ 3–104 (providing within broad limits for review in the Circuit Court of any county, unless venue prescribed).

Other factors which traditionally indicate heightened state interest are not present here either. With all due respect to the plaintiffs, their industry does not profoundly influence Illinois' government or its economy. Moreover, the Commercial Relocation law is limited to counties with populations exceeding 1,000,000 persons.[9] This

---

**6.** The only instance where the Seventh Circuit purported to require *Burford* abstention where arguably none of thee factors was present was in *Kelly Services, Inc. v. Johnson*, 542 F.2d 31 (7th Cir.1976). There the parties presented the court principally with question of whether the Illinois Private Employment Agencies Act, Ill. Rev.Stat. ch. 48, §§ 197 et seq. (1973), covered temporary help agencies. The court noted that no state court had decided the issue, and that regulation of the employment agency industry was a matter of traditional state concern. The court thus abstained, citing *Burford. Kelly Services*, 542 F.2d at 32–33. The Seventh Circuit has seldom cited *Kelly Services* since, perhaps indicating that it was not a proper exercise of *Burford* abstention. Abstention did allow the court to avoid reaching Kelly Services' constitutional claims, however, and permitted the state to resolve a substantial question of state law. The court's decision thus was a proper exercise of abstention under *Pullman*. See *Soo Line R. Co. v. State of Wis., etc.*, 489 F.Supp. 620, 626 (W.D.Wisc.1980) (discussing *Kelly Services* in context of *Pullman* abstention).

**7.** Federal policies can trump the state's interest. See, for example, *Local 519*, 585 F.2d at 1350 (federal interest in arbitration of labor disputes may overcome state's interest in regulating public employees); *Ryan v. State Bd. of Elections of State of Ill.*, 661 F.2d 1130 (7th Cir.1981) (even if state had paramount interest in apportioning congressional districts, federal policy of "one person, one vote" overcomes it); *Matter of Cash Currency Exchange, Inc.*, 762 F.2d 542 (7th Cir. 1985) (*Burford* abstention inappropriate in cases arising under federal bankruptcy code). *Burford* abstention also may be unwarranted where resolution of the issue of state law is easy, and where immediate resolution would promote judicial economy. See, for example, *E & E Hauling v. Forest Pres. Dist., DuPage Cty.*, 821 F.2d 433, 438 (7th Cir.1987).

**8.** The ICC has not argued that the $45.00 ceiling is not severable from the rest of Commercial Relocation Law. If it were not severable, the court would assess this scheme differently.

**9.** See Ill.Ann.Stat. ch. 95½ at ¶ 18a–700(a). Counties with a population of less than 1,000,-

further indicates the relative unimportance of the towers' business to the People and the State of Illinois. It is safe to say that the impact of these businesses on Illinois' economy is not the same as that of the oil industry on Texas's economy, or that of the short-line rail system at issue in *Alabama Comm'n v. Southern R. Co.*, 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951), on Alabama's economy. Abstention under the principles announced in *Burford* is thus unwarranted in this case.

For the reasons stated in this opinion, this court dismisses Count 6 for lack of subject-matter jurisdiction. The court denies the defendants' other motions to dismiss.

000 persons can opt for the law's coverage, but such a decision would indicate the importance of the towing industry to a particular county, not the state as a whole.